[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15613
Non-Argument Calendar

_____

D. C. Docket No. 04-22267-CV-FAM

OMAR R. OSAHAR,

Plaintiff-Appellant,

versus

POSTMASTER GENERAL OF U.S. POSTAL SERVICE,
UNITED STATES OF AMERICA,
ATTORNEY GENERAL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 15, 2008)**

Before BIRCH, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Omar R. Osahar appeals the district court's grant of summary judgment in favor of the Postmaster General as to all of his employment discrimination and related claims. Osahar asserts that the district court erred by finding, inter alia, that he failed to establish that the Postmaster General's articulated legitimate, non-discriminatory reasons for its actions were a pretext for unlawful discrimination or retaliation, that the court lacked jurisdiction over certain of his claims, and that he had failed to exhaust his administrative remedies as to others. We AFFIRM.

## I. BACKGROUND

Osahar, an African-American male proceeding pro se, filed an employment discrimination action against his employer, the Postmaster General, in the Southern District of Florida. Osahar is employed by the United States Postal Service ("USPS") as an electronics technician ("ET"). He has worked for the USPS for more than 30 years.

A. Incidents Alleged

In support of his claims Osahar's complaint asserts the following incidents which allegedly occurred between October 2001 and August 2004 and about which he had already formally complained to the EEOC. At the time he filed suit, he alleged that his EEOC complaints had all been pending for at least six months without a final agency determination.

On or about 22-23 October 2001, a white ET junior to Osahar was allowed to make primary software loads. Osahar contends that this encouraged his co-workers to disrespect him because the primary load is a more desirable assignment. On or about 21 May 2002, (1) Osahar's blue rolling tool box was broken into on several occasions; (2) Osahar's supervisor, Robert Cole, took Osahar's camera away from him when Osahar "tried to take pictures of harassment," even though Osahar had seen others using cameras on the workroom floors; (3) tasks which Osahar preferred were transferred to another shift thereby impacting his ability to work overtime; (4) Osahar was subject to disrespect due to "unfairness in assignment and task"; (5) on or about 29 May 2002, Cole would not allow Osahar to "do the Zebra Card alignment for the AFCS [e]quipment" and also "restrict[ed] his] [i]nvolvement in alignment procedures"; and (6) Osahar was subject to "[c]ontinuous harassment on the workroom floor." R2-30, Second Corrected Final Compl. at ¶ 15.

On or about 16 November 2002, (1) Osahar was decertified on powered industrial equipment because Cole and other management officials scheduled him for training on the day after his last day of certification resulting in the suspension of his privileges; (2) the USPS was "capricious in [o]vertime rotation" in that it "coordinated the task and [o]vertime to give the junior [w]hite and Hispanic

3

employees the advantage," depriving Osahar of his "seniority rights." Id. at ¶ 14. On or about 3-9 December 2002 and 9-10 January 2003, Osahar was "systematically bypassed or told that he could not work sixth day overtime." Id. at ¶ 11. On 28 September 2003 and 28 October 2003, Osahar was (1) not selected for MODSS system training; (2) "[n]ot awarded for work performed on the AFCS" when he had done most of the work and others received awards; and (3) restricted from certain work assignments. Id. at ¶ 12.

On 31 December 2003, (1) a coworker was allowed to use two time cards; (2) a co-worker was allowed access to lockout cabinets when Osahar was not; (3) two co-workers blocked or delayed Osahar's access to his assigned task; (4) Osahar's tool box was pushed out of his assigned area; (5) "[o]thers created an unwanted appearance in [Osahar's] work area"; and (6) "[a]nother co-worker has been allowed to perform [certain work which has given Osahar] limited experience [in that area]." Id. at ¶ 10.

From August 23-26, 2004, Osahar suffered from "unfairness," retaliation and discrimination in training and overtime, by not being selected for two network cabling training courses. He also suffered from (1) the "arbitrary and capricious use of training, seniority qualification and safety in the use of assignments overtime and promotions"; (2) "[d]iscriminat[ion] by encouraging disrespect by

4

unfairness in [a]ssignments, overtime, terms and conditions of employment"; and (3) "[l]os[s] of liberty of the equal protection of the law related to seniority and qualifications." Id. at ¶¶ 17-18. Finally, at an unspecified time, Osahar suffered a "[l]os[s] of liberty of seniority in the selection process" when he was not selected for a training course for Basic Programming of Allen-Bradley PLCs. Id. at ¶ 19. Osahar has also alleged that the USPS has breached settlement agreements with Osahar dated 12 December 1989 and 2 June 1992.

In his final amended complaint, filed in the Southern District of Florida, Osahar has alleged on the basis of these incidents: (1) a "los[s] of liberty normal[ly] given to senior . . . employees in an agency with a seniority system and [t]raining policy" in violation of the equal protection clause of the Fifth Amendment; (2) "[v]iolation of [i]ndividual [c]ontracts concerning fairness in employment with the agency and laws of the state of Florida" in violation of the equal protection clause of the Fifth Amendment. R2-30 at ¶¶ 29-30. Osahar also asserts his complaint "pursuant to the Civil Rights Act of 1964 as amended, 42 [U.S.C .] § 1981 and 42 [U.S.C.] § 1983." Id. at ¶ 1. Finally, Osahar's complaint refers to "39 [U.S.C.] Labor Relations Act, TITLE III, § 301, 29 [U.S.C.] § 185 as related to related issues of [b]reach of individual contracts ([union and non-union])." Id. at ¶ 4.

5

B. <u>General Background</u>

The record reflects the following additional facts:[1]  At all relevant times, Osahar has been assigned to work on Tour 2, the 6:30 A.M. to 3:00 P.M. shift, five days a week and his days off have been Sunday and Monday.  Sunday and Monday are thus the days he is eligible to work a sixth day for overtime compensation. Tour 2 is the preventive maintenance shift and the ETs on this shift perform the cleaning, preparation and testing of all postal equipment.  Daily assignments are made based on the needs of the USPS and the maintenance requirement of each individual piece of equipment.  The particular work assignment given to an ET on Tour 2 during the eight-hour work day does not affect that person's wages, job title, seniority or other employment benefits.

Cole has been Osahar's immediate supervisor from approximately late 2000 to the present.  Cole was supervised by DeWayne Wilkie.  Wilkie was supervised by Joseph Giambrone.  In 2002, Osahar's position was upgraded from a level 9 to a level 10, and in 2003, his position was upgraded from a level 10 to a level 11. Osahar is number three on the seniority list, and he has seniority over all of the co-workers about whom he complains in this case.  During the period at issue, Osahar was never suspended, nor did he suffer any reduction of wages, benefits, seniority,

_____

[1]Herein we have borrowed portions from the orderly recitation of facts set out in the magistrate judge's report and recommendation (R7-158).

6

or job title.

The wages, hours, and working conditions of USPS maintenance craft employees such as Osahar are governed by Article 38 of the collective bargaining agreement in effect between the American Postal Workers Union and the USPS. This agreement permits the USPS to determine daily tasks and assignments. It requires that all training opportunities in levels 1 through 7 be offered first to the senior qualified volunteer within the occupational group, level, and tour where the need for the skills exists. Job-related training in levels 8, 9, and 10 must also be selected from volunteers within the occupational group, level, and tour where the need for the skills exists, except that the employer may choose not to select a volunteer who has attended training for 6 or more weeks during the previous 12 months. Job-related training in levels 8, 9 and 10 is not subject to seniority. The agreement contains no provision with respect to selection for training of employees above level 10.

C. Prior EEO Activity

It is undisputed that prior to and during the time of the events he alleges in his complaint, Osahar had filed formal complaints of discrimination, and that his supervisors were aware of this. Settlement agreements were reached in two cases. The first settlement agreement, which was executed in December 1989, states that

Osahar

> will have the same opportunities as other ET's to work on equipment and do filing updating and software changes. Complainant is [to] be provided the same training and have access to information and pro[cedures] regarding file updating and software changes as other ET's. The complainant is to be treated equally and fairly as other employees. He will be treated the same as Mr. Foland and Mr. Aquilino on learning and working PSDS II. He will be given same opportunity to become proficient as other employees. Based on merit, Mr. Osahar will be granted awards as all other ETs. Specifically, if Bob Foland and Mr. Aquilino receive awards for installation of PSDS System, since I also worked on the system, I receive the same award in relationship to this process.

R(Accordian 2)-127, Exh. 290. The second settlement agreement, which was executed in June 1992, states:

> I will be given the opportunity to work in other areas as all other employees and be given the chance to advance my skills for upward mobility. In the future I be allowed to receive the opportunity to go to seminars and train other ETs in new systems. That I'm treated and paid equal as all other employees. Any and all special assignments [undecipherable] all interested ET's. Schedule meeting and to abide by this and all other EEO Settlements [including] 3-S-1106-90 and 3-S-1157-91 [undecipherable] with this settlement [undecipherable] when available.

Id., Exh. 289. These agreements provide that if the agency fails to abide by the agreements, the USPS will "upon the complainant's written requirest, reinstitute the counseling process." Id., Exhs. 289, 290.

In addition, Osahar has prevailed in the U.S. District Court for the Southern District of Florida on at least two previous complaints alleging discrimination

8

and/or retaliation against the USPS.  In July 2002, Osahar filed another employment discrimination case against the USPS based on twelve EEO complaints involving incidents that occurred between 1995 and 2001, including claims based on hostile work environment and denial of training.  Summary judgment was granted in favor of the USPS in February of 2004.

D. Training

In June 2004 two memoranda were issued soliciting volunteers to attend training courses on Network Cabling Copper Based System Tier 2 and Network Cabling Fiber Based Systems Tier 3.  Neither was a prerequisite for the other, but both were required for Network Cabling Specialist certification.  Three people applied for the courses, Osahar, Oscar Sosa, and D. Sotolongo.  Cole selected Oscar Sosa to attend both courses.

Oscar Sosa is a white Hispanic male who is junior to Osahar.  Cole's selection was approved by Giambrone.  Cole explained in his declaration that the reason for selecting Sosa was that he needed someone who was trained on the Tray Management System (TMS) to be trained with respect to network cabling.  In an affidavit provided in response to the related EEO complaint, Cole further explained that:

> The Miami plant has a machine called TMS (tray management system) which transports all mail in the facility to other processing

9

equipment. For about five months the TMS system has been frequently dropping out of service and causing delays. The TMS trained E.T[.]'s have been working on the problem but feel the problem is in the fiber-optic cabling running throughout the system but none of them are trained on trouble shooting or repairing these fiber-optic cables. Since it was in the best needs of the service to have a TMS trained employee with the cabling training, I chose Mr. Sosa because Mr. Osahar is not TMS trained.

R(Accordian 1)-78, Exh. 116, Aff. B at 1.

In July 2004, a memorandum was issued requesting volunteers to attend a training course entitled "Basic Programming of Allen-Bradley PLCs."[2] There were seven applicants: Osahar, M. Denis (white male), G. Acker (white male), D. Ewing (black male), D. Sotolongo (white Hispanic male), J. Mims (white male), and Julio Fojo (white Hispanic male). Fojo was selected to attend. Since Cole was on vacation at the time the selection was made, Wilkie made the selection, and Cole concurred upon his return. In his affidavit in response to the EEO complaint, Wilkie explains that he selected Fojo because although he was trained to service the TMS system which utilizes Allen-Bradley PLCs, Fojo had not been trained on the Allen-Bradley PLCs. Id., Exh. 69 Aff. D at 1. Cole explains further that Osahar had previously attended RCS training which included Allen-Bradley PLC

_____

[2]PLC stands for "programmable logic controller." A PLC is a computerized device that runs the TMS machine. The device is manufactured by two companies – Allen Bradley and Horner Electric. At the Miami postal facility, the TMS is run by a Horner Electric PLC, but the only training offered is by Allen Bradley; however, the PLC system is the same, regardless of the manufacturer.

training.  Id., Aff. B at 3.  Cole reported that when he discussed this with Osahar, Osahar had acknowledged that he had received the RCS training and that he was trained on the Allen-Bradley PLC, but pointed out that the Allen Bradley training at issue bore a different course number.  Id.

Osahar's complaint relating to MODSS training is less clear.  He was unable to say exactly when in 2003 or 2004 the training occurred but alleged that a white employee, Bob Aquilino, had been chosen to receive the training.  However, the record indicates that Bob Aquilino retired in 2000, well before the alleged training took place.

Records of employee training through the end of December 2005 were submitted for employees Osahar, Sosa, Denis and Fojo, and other employees assigned to Tour 2.  These records demonstrate that the USPS provides a significant number of training courses throughout the year.  For example, Osahar attended 60 training courses between August 1982 and October 2005; nine of those were between 2001 and 2004 and seven were in 2005.  R(Accordian 2)-127, Exh 269.  Denis attended 40 between September 1990 and June 2005; five were between 2001 and 2004 and three were in 2005.  Id., Exh. 267.  Sosa attended 52 between January 1987 and June 2005; ten were between 2001 and 2004 and two were in 2005.  Id., Exh. 263.  Fojo attended 50 between June 1989 and October

11

2005; seven were between 2001 and 2004 and six were in 2005.

D. Overtime

Overtime is assigned on an "as needed" basis, in accordance with the following procedure: At the beginning of each quarter, with respect to each Tour, a list is posted with all the names of the ET's. Each employee then initials the list to indicate whether or not they would like to be considered for overtime. Based upon these responses, the Overtime Desired List (OTDL) is created according to seniority. Thereafter, if a need for overtime arises on a particular day and Tour, upper level management looks at the list to determine which employees are off on that day, and therefore available to be called in to work a sixth day as overtime. From that group, management looks to see which of those employees has the skills and/or certifications needed for the overtime job at issue. From the group of available, qualified employees, the person who is next on the overtime rotation list is selected. Once a person works a sixth day of overtime, that person's name goes to the bottom of the list.

In the affidavit in support of one of his EEO complaints, Osahar averred that during the week before 9 December 2002 he was bypassed for his Monday of overtime, but junior white and/or Hispanic ETs were told they could work a sixth day of overtime; and a few weeks later, Denis worked overtime on AFCS, for

which Osahar asserted Denis was "not trained."  R(Accordian 1)-78, Exh. 82, Aff. A at 7.  The records provided for the twenty-second pay period of 2002 through the second pay period of 2003 reflect that Denis worked sixth-day overtime four times on Fridays and twice on Thursdays, and Osahar worked overtime seven times on Mondays.  See R3-76, Exh. 64 at 123-34.  It is undisputed that Denis did not have the same days off as Osahar at this point.  Thus, they could not have been in competition for the same sixth day of overtime work.[3]

With respect to the complaint in which Osahar asserts unfairness in the overtime rotation including 16 November 2002, Osahar was asked specifically which individual received overtime when Osahar did not.  Osahar identified Oscar Sosa, Mike Denis, Robert Williams, and "possibly some other people."  R4-120 at 201.  Robert Williams is a junior African-American ET.  Osahar does not, in his briefs, point to any place in the record which specifically identifies a day on which he was available to work a sixth day of overtime but wrongfully deprived of that opportunity because the USPS assigned that day to someone else.[4]  We are unable

_____

[3]When asked, at his deposition, to explain his claim regarding the opportunity to work a sixth day of overtime, Osahar could not explain how evidence of overtime worked by people with different days off, on days he was already working his regular schedule, would demonstrate discrimination or retaliation against him.  See R4-120 at 114-17.

[4]Overtime records for the last quarter of 2002 do include two instances in which Sosa worked a sixth day of overtime on a Sunday in the same week that Osahar did not work any overtime.  But, overall, Sosa only worked two sixth days more than Osahar, and one during a week in which Osahar was apparently not at work since he does not appear to have worked his

to find any occasion in the record upon which Osahar did not receive a sixth day of overtime to which he was entitled, or any instance of a junior employee receiving more sixth days of overtime on Sundays and Mondays than Osahar did.[5]

E. Procedural History

In response to Osahar's complaint, the USPS asserted, inter alia, that all of the employment actions alleged in the complaint were taken for legitimate, non-discriminatory reasons, and that Osahar failed to exhaust his administrative remedies as to certain of his claims. After discovery was complete, the USPS moved for summary judgment as to all claims. Osahar filed a motion for summary judgment as well.

Adopting a report and recommendation (R&R) made by the magistrate judge, the district court granted the USPS motion for summary judgment and denied Osahar's amended motion for summary judgment. The magistrate judge

---

regular Saturday workday either. See R(Accordian 1)-78, Exh 82, Aff. C at 32-43 (see particularly 33). Other records covering the first week of the twenty-first pay period in 2003 through the second week of the sixth pay period in 2004, indicate that, with the exception of 2003-21-1 and 2003-24-1, Denis's regular days were Saturday through Wednesday. R(Accordian 2)-127, Exh. 293 at 657-724. There is one week, 2003-21-1, during which he appears to have worked regular days Monday through Friday and a sixth day of overtime the Sunday before that. Id. at 701. Corresponding records for Osahar during this period are not included. Further, Osahar fails to explain exactly how any of these records demonstrate that he was available for overtime, but denied it in favor of someone else.

[5]Because Osahar's appeal is limited to issues related to training and overtime opportunities, we omit further discussion of facts related to other workplace incidents regarding tool boxes, trash, and access to work areas which were raised only in Osahar's complaint.

had made the following findings with regard to Osahar's claims: (1) Osahar could not show disparate treatment based on his race because he could not establish an adverse employment action, or that similarly situated employees who were not in the protected class were treated more favorably; (2) he could not establish a prima facie case of retaliation; (3) he could not show that his employer's proferred legitimate, non-discriminatory reasons for its actions were a pretext for unlawful discrimination or retaliation; (4) the incidents alleged were not sufficiently pervasive or severe to create a hostile work environment; (5) he failed to exhaust his administrative remedies with regard to his breach of contract claim; (6) the district court lacked jurisdiction to consider Osahar's claims under 42 U.S.C. §§ 1981 and 1983 because the Postmaster "is an official of the United States acting in his official capacity, and the United States had not waived its sovereign immunity as to" these claims, R7-158 at 45, and Osahar's claim pursuant to § 1983 also failed because that section applies only to violations of federal constitutional rights under the color of state law; and (7) Osahar's claim of unfair union representation had been improperly included in his response to the Postmaster General's motion for summary judgment because Osahar had not asserted that claim in his final complaint, and even if the court were to consider it on the merits, the Union's decision not to take Osahar's grievances to arbitration was not so far

15

outside a wide range of reasonableness so as to be irrational.

On appeal, Osahar rehashes his arguments regarding the USPS's alleged discriminatory and retaliatory decisions regarding job assignments, and training and overtime opportunities. He also asserts his arguments regarding claims pursuant to 42 U.S.C. §§ 1981 and 1983 and exhaustion of administrative remedies.[6]

## II. DISCUSSION

We review a district court's grant of summary judgment is reviewed <u>de novo</u>. <u>Rojas v. Fla. Dep't of Bus. & Prof'l Regulations Pari-Mutual</u>, 285 F.3d 1339, 1341 (11th Cir. 2002) (per curiam). A court shall grant summary judgment when the evidence before it shows "that there is no genuine issue as to any material

---

[6]Osahar additionally asserts that the district court erred by not addressing his disparate impact claim. A review of the record shows that, although Osahar made a passing reference to a disparate impact claim in the first three pages of his complaint, he never presented argument in support of the claim. For this reason, he may not raise the issue on appeal. <u>See</u> <u>Narey v. Dean</u>, 32 F.3d 1521, 1526-27 (11th Cir. 1994) (subject to five exceptions, none of which are applicable here, "appellate courts generally will not consider an issue or theory that was not raised in the district court.").

Similarly, Osahar contends that the district court erred in granting summary judgment in favor of the Postmaster General on his unfair representation claim pursuant to the Labor Management Relations Act, 29 U.S.C. § 185. Although Osahar did argue this claim before the district court at the summary judgment stage, it goes beyond the relief he requested in his final amended complaint. Accordingly, the district court properly granted summary judgment <u>See</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (per curiam) (new claims may not be added in a brief opposing summary judgment).

Finally, Osahar has abandoned his hostile work environment claim by not arguing in support of it in his briefs on appeal. <u>Greenbriar, Ltd. v. City of Alabaster</u>, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (issue is waived on appeal where party "elaborates no arguments on the merits as to [the] issue in its initial or reply brief").

16

fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." Rojas, 285 F.3d at 1341-42 (citation and quotations omitted).

"Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam). However, in the context of summary judgment, even though pro se pleadings are entitled to a more lenient interpretation, "the plaintiff must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997) (per curiam) (appending district court order). Further, even for pro se litigants, "issues not raised below are normally deemed waived." Tannenbaum, 148 F.3d at 1263.

A. Title VII Disparate Treatment

Title VII prohibits an employer from discriminating against a person based, inter alia, on that person's race. See 42 U.S.C. § 2000e-2(a)(1).[7] Under Title VII, a "plaintiff always bears the ultimate burden of proving discriminatory treatment by

_____

[7]42 U.S.C. § 2000e-16 extends the protection afforded by Title VII to employees of the USPS.

17

a preponderance of the evidence." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Absent direct evidence of an intent to discriminate, a plaintiff may prove his case through circumstantial evidence, using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). The first step is to establish a prima facie case of racial discrimination, which a plaintiff may do by showing that: (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam). An adverse employment action must effect "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). Further, regardless of the employee's subjective view, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances."[8] Id.

If the plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse

---

[8]This standard is unaffected by the Supreme Court's decision in Burlington Northern & Santa Fe Ry. v. White, __ U.S. __, 126 S.Ct. 2405 (2006). The Court clarified that its discussion of the standard for an adverse employment action with regard to retaliation claims did not apply to substantive discrimination claims brought pursuant to Title VII. See id. at 2414.

18

employment action. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination. See id. at 804, 93 S. Ct. at 1825; Holifield, 115 F.3d at 1565. The inquiry into pretext requires us "in view of all the evidence, [to] determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and quotations omitted). "[A] plaintiff may not establish [pretext] merely by questioning the wisdom of the employer's reason." Id. at 1543. Instead, the plaintiff must "meet [the employer's reason] head on and rebut it." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir 2004).

First, during the period at issue, Osahar was never suspended, nor did he suffer any reduction in wages, job title, seniority status or any other benefits. He also attended more training courses than all but one of the co-workers about whom he complains; Sosa attended ten courses between 2001 and 2004 while Osahar attended nine. As far as the record reflects, he worked a comparable number of sixth days of overtime to each of them as well. Accordingly, we find that he has

19

not raised a genuine issue of material fact as to an adverse employment action sufficient to qualify him for a disparate treatment claim. See Davis, 245 F.3d at 1239.

Second, even assuming that the extent to which Osahar alleges to have been bypassed for overtime assignments did rise to the level of adverse employment action, Osahar has failed to point to any record evidence[9] that he was both qualified and available to work overtime under the USPS system for assigning it, but was passed over in favor of someone else. Further, he does not dispute Cole's statement that USPS employees are not entitled to overtime and that Osahar has worked at least one sixth day of overtime in every quarter since Cole became Osahar's immediate supervisor in late 2000. Accordingly, we find that Osahar has failed to raise a genuine issue of material fact as to whether the reasons given by the USPS as to why Osahar was not offered a sixth-day overtime assignment as often as he might have liked were pretext for racial discrimination.

Third, even assuming that Osahar could establish a prima facie case of disparate treatment as to training courses, Osahar does not dispute that he has not attended formal TMS training or that he has never volunteered to attend. Neither

---

[9]Osahar does allude to documentary evidence not contained in the record, but does not even go so far as to specify the nature of this evidence. Appellant's Br. at 23 ("See exhibits supplied will supply [sic] on Monday").

does he point to any evidence that calls into doubt Cole's assertion that he needed someone who was TMS trained to do the network cabling courses. Similarly, Osahar has failed to point to any evidence that might rebut Cole's assertion that Osahar was not selected for a certain Allen-Bradley training course because Osahar had already attended a course that covered the same material. Accordingly, we find that Osahar has not offered sufficient evidence to raise a question as to whether the USPS's proffered legitimate, non-discriminatory reasons for not sending him to certain training programs – that he was not Tray Management System ("TMS") trained (in connection with network cabling) and that he had already received some Allen Bradley PLC training – were pretext for unlawful discrimination. See Wilson, 376 F.3d at 1088.

B. Title VII Retaliation

Title VII also prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]. 42 U.S.C. § 2000e-3(a). "A prima facie case of retaliation contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the

protected expression." Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002) (quotations omitted). Just as in a case of substantive discrimination, "[o]nce the plaintiff establishes his prima facie case [of retaliation], the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." Holifield, 115 F.3d at 1566 (citation omitted).

After the district court granted summary judgment in this case, the Supreme Court clarified that, in the context of claims brought pursuant to the anti-retaliation provision of Title VII, an adverse employment action includes those "employer actions that would have been materially adverse to a reasonable employee or job applicant." Burlington N. & Santa Fe Ry. v. White, ___U.S.___,126 S. Ct. 2405, 2409 (2006). Consequently, the district court's conclusion, that Osahar had not demonstrated that he suffered an adverse employment action, is based on a legal standard that is no longer controlling. Nevertheless, for the same reasons discussed in the context of his disparate treatment claims, Osahar has failed to raise a genuine issue of material fact as to whether the legitimate, non-discriminatory reasons for its actions articulated by the USPS might be a pretext for unlawful retaliation. See Holifield, 115 F.3d at 1566. Therefore, summary judgment was

22

properly granted in favor of the Postmaster General.

C. Claims Under 42 U.S.C. §§ 1981 and 1983

Osahar argues that the district court erred by dismissing his claims brought pursuant to 42 U.S.C. §§ 1981 and 1983 for lack of subject matter jurisdiction. Because 42 U.S.C. §§ 1981 and 1983 apply only against impairment of equal rights, or violations of federal or constitutional rights, under color of state law, and because Osahar complains about actions taken under color of federal law, those claims were due to be dismissed for failure to state a claim upon which relief could be granted. 42 U.S.C. § 1981(c); 42 U.S.C. § 1983; Lee v. Hughes, 145 F.3d 1272, 1277 & n.5 (11th Cir. 1998).

Nevertheless, because Osahar brings his claims pro se, we also consider the possibility of a Bivens-type constitutional tort claim.[10] Given jurisdiction, creation of a Bivens-type remedy is only appropriate "where (1) the petitioner has no alternative means of obtaining redress, and (2) there are no special factors counseling hesitation." Lee v. Hughes, 145 F.3d 1272, 1275 (11th Cir. 1998) (quotation and citation omitted). As we have previously observed, Congress has already provided an adequate alternative means of obtaining redress in the form of "final and binding grievance provisions in the Postal Service collective bargaining

---

[10]Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971).

23

agreements, 39 U.S.C. § 1206(b)." McCollum v. Bolger, 794 F.2d 602, 607 (11th Cir. 1986) (relying on Bush v. Lucas, 462 U.S. 367, 103 S. Ct. 2404 (1983)). Accordingly, Osahar may not maintain any constitutional tort action in connection with his employment discrimination claims.

Even if he could, we have confirmed that Title VII "is the exclusive remedy for a Postal Service employee alleging illegal discrimination." Nagy v. U.S. Postal Service, 773 F.2d 1190, 1192 (11th Cir. 1985) (citing Brown v. Gen. Servs. Admin., 425 U.S. 820, 96 S.Ct. 1961 (1976)). Accordingly, all of Osahar 's non-Title VII employment discrimination and retaliation claims, which were asserted based on the same evidence, were properly dismissed on that basis.

D. Breach of Settlement Agreements

Finally, Osahar argues that the district court erred by finding that he failed to exhaust his administrative remedies with regard to the alleged breach of the two settlement agreements. Exhaustion of administrative remedies is a precondition to bringing any Title VII claim. See Brown v. General Servs. Admin., 425 U.S. 820, 832 (1976); Crawford v. Babbitt, 186 F.3d 1322,1326 (11th Cir. 1999).

The settlement agreements specifically state that in the event of a breach, Osahar must file a written request with the USPS either to reinstate the settled complaint for further processing from the point at which processing ceased under

24

the terms of the settlement agreement or to reinstate the counseling process. R(Accordian 2)-127, Exs. 289-91.   Further, EEOC regulations require a complainant, within 30 days of the time he knew or should have known of any alleged noncompliance , to notify the EEO director in writing of that noncompliance.  29 C.F.R. 1614.504(a).

The record does not reflect that Osahar ever contacted the USPS EEO office alleging breach of either settlement agreement identified in his complaint or that he filed a written request to reinstate the settled complaint as mandated by the agreements.  Because Osahar has failed to perform the required acts, he has failed to exhaust his administrative remedies for the alleged breaches of settlement agreements.  The district court, thus, properly found that it lacked jurisdiction to consider those claims.

### III. CONCLUSION

Osahar appeals the district court's grant of summary judgment in favor of the Postmaster General as to all of his employment discrimination and related claims.  Because Osahar failed to establish pretext with respect to his Title VII claims, the court properly granted summary judgment in favor of the Postmaster General.  Because he failed to exhaust his administrative remedies with respect to his breach of settlement agreement claims, and because Title VII provides the

25

exclusive remedy for employment discrimination actions brought by federal

employees, his remaining claims were properly dismissed. Accordingly, we

**AFFIRM**.