JOHN GLEESON, District Judge,
dissenting.
A jury found that Entergy retaliated against James Tepperwien for complaining of Vito Messina’s ongoing sexual overtures and unwanted sexual contacts. It also found that Entergy’s treatment of Tepperwien warranted punitive damages. These verdicts are entitled to deference. In passing on Entergy’s application for judgment as a matter of law, we are obligated to view the evidence in the light most favorable to Tepperwien, Galdieri-Ambrosini v. Nat’l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998), and the majority holds that we may grant the motion only if the evidence, so viewed, is so deficient that the jury’s findings could only have been the result of sheer surmise and conjecture. Op. at 567 (citing Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir.2008)). Because the majority ignores the first of these principles and pays only lip service to the second, I respectfully dissent.
A. Factual Background
Viewed in the light most favorable to Tepperwien, evidence presented at trial established the facts set forth below.
Beginning in 2003, Vito Messina, who occupied a position superior to Tepperwien’s at Indian Point, began sexually harassing him. Messina had been sexually harassing men at Indian Point for many years. Messina told Tepperwien that he wanted to have sex with him and that Tepperwien could get him better jobs at the plant if he acceded. The ongoing abusive sexual banter graduated in November 2004 to a sexual assault, which is when Tepperwien began to complain.
On November 16, 2004, Tepperwien reported the sexual assault to Human Resources. This was his first complaint of sex discrimination, and the first “factfinder” against him soon followed. Essentially, a factfinder at Indian Point is a direction to an employee to show cause why he or she shouldn’t be found to have violated a rule. For example, as Entergy employee and union shop steward Alfred Hicks explained at trial, “[i]f someone was absent ‘x’ number of days, the company *575 would ask for a fact-finder to find out why this employee was absent so many days.” J.A. 440. Depending on the information gleaned through the factfinder, disciplinary action, including termination of employment, could follow.
The first factfinder against Tepperwien subjected him to an allegation that he had abused his sick time privileges while he was hospitalized due to a work-related injury from early December to December 28, 2004. The alleged “abuse” was his failure to report his hospitalization within 24 hours, even though he could not have reported it during that period because he was in critical care for internal bleeding.
In August 2005, Messina, unpunished and undeterred, came on to Tepperwien again. They were together in a work vehicle when Messina said he found Tepperwien attractive and put his hands on Tepperwien’s shoulders, neck and hair. When Tepperwien protested, Messina insisted that Tepperwien really wanted Messina to touch him just as much as Messina wanted to do the touching. Besides, Messina said, “I’m going to touch you as much as I want, and there’s nothing you can do about it.” J.A. 205. When Tepperwien continued to object, Messina responded by saying how “cute” he was being by “playing hard to get.” J.A.205.
Tepperwien reported the incident immediately. The initial response of the Site Security Superintendent, John Cherubini, was, “[W]hy didn’t you punch him out?” J.A. 210. Tepperwien explained that a fight between two armed men could easily escalate into something that would have to be reported to the Nuclear Regulatory Commission (“NRC”), which Cherubini agreed had to be avoided. As for Messina, when he was confronted about Tepperwien’s complaint he admitted stroking Tepperwien’s hair. Entergy thereupon “punished” him by placing him on ten weeks of paid leave.[1]
Entergy brought Messina back to work in early November 2005 without taking any steps to protect Tepperwien from him. Tepperwien complained about this to Terrence Barry, the Security Manager at Indian Point. Barry first laughed him off and then told Tepperwien that if Messina sexually harassed him again, Tepperwien should report it to management. Tepperwien observed that he’d done that before, twice in fact, but it hadn’t done much good because Messina was once again back in the workplace in close proximity to Tepperwien. Barry accused Tepperwien of being “overemotional” and threatened to kick him off the site. J.A. 218.
This exchange occurred on November 16 or 17, 2005, and once again a factfinder closely followed Tepperwien’s protected activity. Specifically, in early January 2006 the “missing equipment” factfinder commenced. Tepperwien objected to the inquiry, claiming he was being falsely accused, and Lieutenant Sanfilippo — who was conducting the factfinder on behalf of Entergy — essentially agreed with him. “Out of all the guys that we should be talking to about this,” Sanfilippo told Tepperwien, “you’re the least likely guy we should be fact-finding.” J.A. 237.
Later in January, Tepperwien escalated his complaint of sexual harassment by taking it outside of Entergy to the NRC. Entergy’s retaliation escalated as well. The very next week, on January 22, 2006, the missing equipment factfinder was ratcheted up to a “counseling,” a sanction that Entergy itself characterizes as “disci *576 pline.” J.A. 881; J.A. 238. Lieutenant Jason Hettler and Site Security Supervisor James O’Brien conducted the counseling session. Tepperwien told them the counseling was retaliation for going to the NRC the previous week and asked why they were giving him a counseling. They responded that they did not want to be doing it but were ordered to do so by Cherubini.
One day during the following week, Barry was determined to grill Tepperwien about the NRC complaint, but it was Tepperwien’s day off. So Barry called Tepperwien and lied to him to lure him into work. Barry said someone was needed on a “regulatory matter” and Tepperwien’s name had been “picked out of a hat.” J.A. 247. Tepperwien told Barry he had doctors’ appointments scheduled for that day, but Barry insisted. Barry falsely assured Tepperwien it was simple matter, lied to him about who would be present, and said he would regard it as a “personal favor” if Tepperwien helped out and it would take but a half-hour of his time. Id. When Tepperwien came in, Barry and two Entergy lawyers confronted him about the NRC complaint. Tricked into an obviously adversarial situation, Tepperwien sensibly asked if a record could be made of what was said. He was told no, and he was further told that if he persisted in the request it would be considered a failure to cooperate and would be grounds for terminating him. The purported half-hour matter became a hostile three-hour interview about his sexual harassment complaint, at which Entergy’s lawyer questioned Tepperwien about, among other things, the January 22 counseling.
Meanwhile, Tepperwien had to deal with having been disciplined in the form of that counseling.[2] It was a substantial undertaking. The appeal mechanism was a procedure before the Employee Concerns Program at Entergy. Tepperwien was advised by Barbara Taggart of that program to consult an attorney before commencing the process, which he did. He was required to “put everything in writing,” J.A. 239, which he did, in a lengthy submission. He had to meet with Taggart in mid-February to discuss his appeal. Although he finally succeeded in persuading Taggart that he had been improperly disciplined, it took Tepperwien more than six weeks, from January 22, 2006 through March 6, 2006, to remove the stain of the counseling from his record. As Cherubini himself put it after the counseling was rescinded on March 6, Tepperwien was disturbed at the fact that he had to go to Employee Concerns to erase the discipline from his record.[3]
B. The Jury Finding of Retaliation
Viewing the evidence, as we must, in the light most favorable to Tepperwien, there is no justification for the majority’s holding that the jury’s finding of retaliation amounted to sheer surmise and conjecture. In concluding otherwise, the majority begins by saying that factfinders at Entergy were not, as a matter of law, materially *577 adverse employment actions because they were “common occurrences,” that Tepperwien acknowledged factfinders were helpful in most situations, and that “there was good reason for Entergy to initiate” the factfinders against Tepperwien. Op. at 569.
Factfinders were indeed common occurrences, but not for Tepperwien. He had none until he started engaging in protected activity in November 2004,[4] and then they happened like clockwork after each of his complaints about Messina. The majority correctly points out that “[cjontext matters” in our determination of whether employer action is materially adverse, Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69, 71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), and it is thus relevant to our analysis that factfinders were common at Entergy. However, Burlington Northern instructs us that the material adversity inquiry probes the “perspective of a reasonable person in the plaintiff’s position.” Id. at 69-70, 126 S.Ct. 2405 (emphasis added). Here then, we must consider the perspective of a reasonable person who, like Tepperwien, had never been subject to any factfinders before making a complaint of discrimination.[5] A reasonable person in such a position may well have been dissuaded from making a future charge of discrimination, despite the fact that factfinders were common for other employees, and the jury acted within reason in so finding.
Second, although Tepperwien indeed testified that in “most situations, fact-finders are there to be helpful,” J.A. 229 (emphasis added), the clear import of his testimony as a whole is that in his situation, the factfinders and the counseling (among other things) were harmful because they raised the specter of discipline and were issued not to address a genuine workplace concern but as punishment for his protected conduct. During one factfinder, Tepperwien told the investigating officers that the factfinder was “just another witch hunt, trying to pin something on me.” J.A. 270. He told the officers conducting the missing equipment factfinder that he was being made a “scapegoat,” and Sanfilippo essentially agreed there was no basis for the factfinder. J.A. 237. Tepperwien also explicitly told Hettler and O’Brien, who conducted the counseling that followed the missing equipment factfinder, that he thought the counseling was retaliation for his complaint the week before to the NRC. In short, the majority’s sugges *578 tion that Tepperwien himself characterized the factfinders and counseling as “helpful” is an unfair characterization of his testimony as a whole and disregards our responsibility to view the facts in the light most favorable to Tepperwien.
The majority’s finding that there were “good reason[s]” for the factfinders usurps the jury’s role. The inference that the factfinders were unwarranted efforts to pin something on Tepperwien was supported not only by Tepperwien (though his testimony alone is sufficient to sustain the jury’s verdict), but also by Entergy’s own investigators. As discussed above, Sanfilippo admitted that of all the people at Entergy he should have been talking to about the missing equipment, Tepperwien was the least likely candidate for a factfinder. And when that bogus factfinder was escalated to a counseling right after the complaint to the NRC, Hettler and O’Brien told Tepperwien they did not want to be subjecting him to the counseling but were ordered to do so by Cherubini. The jury was permitted to conclude from this evidence, from the tight temporal proximity between Tepperwien’s complaints and the factfinders and from the overt hostility of Barry towards Tepperwien and his complaints, that the factfinders were not justified by “good reasons” at all but instead served to punish Tepperwien for his protected conduct.
The majority also finds, as a matter of law, that not even the counseling of Tepperwien was a materially adverse employment action. Its lengthy and strained reasoning ignores the real-world consequences inflicted on Tepperwien immediately after he took his complaint outside of Entergy to the NRC: (a) the counseling, which was a form of discipline, became part of his employment record; (b) to challenge the discipline, he needed to invoke the grievance procedures of the Employee Concerns Program; (c) at the urging of the Employee Concerns Coordinator, he had to consult an attorney; and (d) the grievance process took six weeks and required him to file a detailed written submission and to submit to an interview with the coordinator.
That’s a lot of trouble to go through in exchange for complaining of workplace discrimination. It’s certainly enough to dissuade a reasonable worker from making such a complaint. Yet the majority holds that the jury’s finding to that effect amounted to sheer surmise and conjecture.
The remainder of the majority’s opinion in this regard divides and purports to conquer the various other bad things that happened to Tepperwien on the heels of his complaints about Messina. The result neither fairly characterizes the evidence nor convinces. For example, trivializing the remarkable fact that Tepperwien’s complaint that he wasn’t being protected from Messina caused Barry to threaten to toss Tepperwien off the work site, the majority says the threat “was made after Tepperwien facetiously asked whether he could ‘kick Vito in the groin.’ ” Op. at 571 (quoting J.A. 217). But that leaves out some evidence. Barry’s threat came after Tepperwien’s statement, but something important happened in between. Specifically, Barry told Tepperwien to use the company’s reporting policy if Messina harassed him again. Then Tepperwien, who moments earlier had told Barry that “Entergy’s policies on sexual harassment and violence in the workplace are not worth the paper they’re written on,” protested that he had already “done that twice.” J.A. 217. That’s when Barry made his threat. The jury rationally could have concluded that because Barry’s threat immediately followed a discussion about making future complaints, a reasonable person would have been discouraged, if not dis *579 suaded altogether, from making any such complaints.
The most egregious example of appellate-court-as-factfinder is the majority’s reliance on Tepperwien’s “Separating Employee Survey.” See Op. at 572. When he left Entergy, Tepperwien indicated on a form that he liked his job and that he’d consider working there again. Without explaining why, the majority finds this useful in determining as a matter of law that Entergy did not subject him to materially adverse employment consequences in retaliation for his complaints about Messina. One obvious defect in this approach is that liking one’s job or considering returning to it and reasonably feeling deterred from complaining about sexual harassment are not necessarily inconsistent, let alone mutually exclusive, as the majority suggests. But more importantly, Tepperwien gave testimony explaining his answers on the survey, which the majority fails to mention. When asked why he wrote that he would consider working for Entergy again, he told the jury that he “didn’t want to appear to be a disgruntled employee.” J.A. 282. He elaborated that when filling out the survey he was “thinking about what was going to happen in the future,” was concerned about whether he was “going to be able to go to work in another power plant” or “get another armed security position,” and believed the exit survey “could easily follow [him]” as he sought future employment. J.A. 284.
Weighing facts like Tepperwien’s exit survey responses and his at-trial explanations of those responses, alongside all of the other evidence in the case, is quintessentially the function of the jury, not a court on post-verdict review. The jury in Tepperwien’s case heard about his exit survey, just as it heard Tepperwien’s explanations for the answers he gave in that survey, and it found that Tepperwien had been subjected to actions that would dissuade a reasonable worker from complaining of discrimination. Our job here is limited to determining whether the evidence, viewed in the light most favorable to Tepperwien, supports that verdict, not to troll the record for facts that might have supported a different one.
Contrary to the majority’s suggestion, protecting employees from retaliation by employers does not amount to treating them “with kid gloves or in a genteel fashion,” Op. at 572, or “delicately,” id. at 573. Nor is Title YII’s commitment to such protection diluted when the workplace has security risks, like a nuclear power plant or a law enforcement agency. There is no tension between effective security and requiring an employer to respect an employee’s right to make good faith complaints of employment discrimination without being subjected to materially adverse actions by the employer. The majority’s needless suggestions to the contrary have no support in logic or our case law, and by demeaning the antiretaliation provision in Title VII they create the potential for mischief in this and other unspecified “contexts” in which employers will be permitted to treat employees in the “rough and tumble manner” in which Tepperwien was treated in this case. Op. at 572.
Finally, though jury findings are always entitled to great deference, it is hard to conjure a context in which they deserve it more than in this one. The Supreme Court has emphasized that the determination of whether challenged conduct meets the materially adverse standard is especially fact-intensive. In Burlington Northern, it stated that “the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a *580 constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.” 548 U.S. at 69, 126 S.Ct. 2405 (internal quotation marks omitted). And earlier this year, in Thompson v. N. Am. Stainless, LP, — U.S. —, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011), the Court stated that “[g]iven the broad statutory text and the variety of workplace contexts in which retaliation may occur, Title VII’s antiretaliation provision is simply not reducible to a comprehensive set of clear rules.” Id. at 868. Retaliation claims thus implicate a broad remedial provision, violations of which are determined only after a searching review of all aspects of the challenged actions and the wider context in which they occurred in order to determine the “real social impact of workplace behavior.” Jurors are obviously better suited to determining the social impact of contemporary workplace behavior than are judges. The majority thus not only usurps the proper role of the jury but substitutes for that body a factfinder with significant, perhaps even disabling, institutional limitations.
C. The Award of Punitive Damages
For the same reasons it sets aside the jury’s verdict in favor of Tepperwien on the retaliation claim, the majority also sets aside the jury’s award of punitive damages. Op. at 572-73. The majority twice repeats its conclusion that a jury could “only find” that Entergy tried in good faith to comply with its obligations under Title VII. Op. at 573, 573-74. I disagree.
The jury reasonably could have inferred employer bad faith from evidence, when viewed in the light most favorable to Tepperwien, that established the following:
• Vito Messina was a problem of long standing in the Indian Point workplace. He had previously molested O’Hara, Tepperwien’s union representative. And ten years prior to the events giving rise to this case, O’Hara’s father (who appears also to have worked at Indian Point) had said “that’s just the way Vito is.” J.A. 327. That “way” was the way Entergy allowed him to be.
• Messina began harassing Tepperwien in 2003. After a physical sexual assault in November 2004, he began reporting the harassment. However, shortly after each in-house complaint was made, he was hassled by a bogus factfinder, and after the NRC complaint was made, he was hassled by a bogus counseling, all despite a spotless prior record.
• The sexual abuse continued, and in August 2005 there was another physical touching of Tepperwien in a sexually suggestive manner. Tepperwien immediately reported that event, and even though Messina admitted inappropriately touching the victim’s hair, his “punishment” consisted mainly of ten weeks of paid leave.
• In fact, Barry had wanted to fire Messina, but after speaking to “unnamed others” at Indian Point he had to reverse course and bring Messina right back into the workplace. J.A. 216-17. The influence of those unnamed others was why Messina taunted Tepperwien by saying “I’m going to touch you as much as I want, and there’s nothing you can do about it.” J.A. 205.
• When Tepperwien reminded Barry of the prior harassment and asked what was going to be done to protect him against further harassment, Barry’s first reaction was to “laugh[ ] ... off’ the concern. J.A. 439.
*581 • His second reaction was to tell Tepperwien that if Messina molested him again, he should just report it. When Tepperwien protested that that was insufficient because Messina’s abuse had previously been reported twice and here he was being welcomed back into the workplace in close proximity to him, Barry accused him of being “overemotional” and threatened to kick him off the site. J.A. 218.
• Right after Tepperwien complained to the NRC in January 2006, Barry lied to him to lure him to a meeting on his day off for the sole purpose of interrogating him about the complaint. Then a company lawyer threatened to fire Tepperwien for insisting on recording what was obviously an adversarial confrontation.
• When a scheduled “outage” (i.e., a turning off of the nuclear reactors) in early 2006 occasioned a meeting involving the security management and staff, Barry made his hostility toward Tepperwien clear to all. In responding to the outage, Entergy put Messina back together with Tepperwien, requiring him to move to the less desirable night shift to escape Messina.[6]
These actions reek of bad faith. The jury was fully justified in weighing all the evidence and concluding that Entergy was more interested in protecting Messina from the consequences of his own sexually harassing behavior than in protecting his victims from retaliation when they brought that behavior to Entergy’s (and the NRC’s) attention.
D. The Amount of Punitive Damages
The jury in this case heard the typical instructions regarding punitive damages. It was told that such damages may be awarded in its discretion to punish Entergy for outrageous conduct or to deter it from engaging in similar conduct in the future. It was specifically asked to consider whether Entergy “may be adequately punished by an award of actual damages only.” J.A. 799. As for the amount of any punitive damages, the jury was told that “in fixing the sum to be awarded, you should consider the degree to which Entergy should be punished for its wrongful conduct and the degree to which an award of one sum or another will deter Entergy or companies like Entergy from committing wrongful acts in the future.” J.A. 799-800.
Equipped with those and other instructions, the jury decided that Entergy, whose attorney argued to the jury that there could be no liability unless Tepperwien proved that Messina was a homosexual, needed punishment and deterrence, so it awarded $500,000 in punitive damages. Though the calculation of such damages is anything but a precise science, given Entergy’s size, it’s difficult to quarrel with the jury’s assessment that an award of that size was necessary in order to finally get Entergy’s attention, except to say that it exceeds the statutory cap of $300,000, of which the jury was unaware. 42 U.S.C. § 1981a(b)(3). Thus, I would reduce the punitive damages award to $300,000 but otherwise uphold the jury’s verdict.
* * # * * *
*582 At first blush the configuration of verdicts in this case seems anomalous. One would think that employer conduct that is sufficiently egregious to warrant $500,000 in punitive damages would also result in damage to the plaintiff, and hence merit an award of compensatory damages. But a review of the trial record reveals that Tepperwien, a former member of the Strategic Air Command who wore a military bearing on his sleeve, was presented even by his own attorneys as a tough and honorable soldier who refused to buckle under Entergy’s mishandling of his complaints about Messina. The jury’s determinations that he needed no compensation despite Entergy’s acts of retaliation but that Entergy needed to be punished and deterred cannot reasonably be characterized as the result of surmise or conjecture; to the contrary, they were amply supported by the evidence at trial. I therefore respectfully dissent.

. Messina was also supposed to attend counseling, but he testified that he didn’t, and Entergy never followed up on it.

. There is no dispute that Tepperwien was subjected to a counseling session on January 22, 2006. See J.A. 881-82 (describing January 22 "conversation” as a “counseling” and a “counseling session”); J.A. 874 ("rescinding] the counseling session”). There is similarly no dispute that a counseling session at Entergy constitutes "discipline.” See J.A. 881-82 (form "documenting] disciplinary action(s)” and identifying the action at issue as the equipment counseling).

. Finally, in mid-March 2006 Tepperwien filed a formal charge with the EEOC. Thus ensued a bogus (and eventually aborted) fact-finder regarding allowing an officer who had a strong smell (possibly alcohol) into the facility-

. The majority terms the evidence on this point "equivocal,” Op. at 569, but it isn’t, and not even Entergy suggests that it is. The first factfinder against Tepperwien, which he indeed claims was an act of retaliation, see Brief for Appellant at 18, was brought in December 2004, shortly after his first complaint of sexual harassment. Even if the evidence were equivocal, our obligation when confronted with such evidence in this posture is to view it in the light most favorable to Tepperwien.

. The majority erroneously claims that Tepperwien’s discipline-free history prior to his protected activity goes only to the question of whether Entergy had a retaliatory motive, a question not before us here. Op. at 569-70. But Tepperwien's employment history is an integral part of the material adversity inquiry because it forms the figurative shoes occupied by the reasonable person we must hypothesize. Indeed, by premising its determination that the factfinders were not materially adverse on its factual finding that they were justified by good reasons, the majority itself acknowledges that evidence of retaliatory motive and evidence of material adversity often cannot be neatly separated. As I explain below, see infra 6-7, to the extent that the justification for an employer’s action bears on the adverse impact of the action, the evidence of the so-called "good reasons” for the factfinders is insufficient to require us to hold, as a matter of law, that that they were not materially adverse actions.

. The majority makes much of the fact that Tepperwien asked to be moved to the night shift. Op. at 571-72. But as the district judge observed at trial, Entergy scarcely deserves credit when an employee it failed to protect “got out of Dodge.” J.A. 652. It's one thing if the company separates the harasser from the victim, but "if the separation of the two is done not by the company but by the victim,” that hardly helps the company’s case. Id. As the district court pointed out, the company could have moved Messina to the less desirable night shift instead of requiring by its own inaction that Tepperwien move himself there.