Justice Breyer
delivered the opinion of the Court.
Title VII of the Civil Rights Act of 1964 forbids employment discrimination against “any individual” based on that individual’s “race, color, religion, sex, or national origin.” Pub. L. 88-352, §704, 78 Stat. 257, as amended, 42 U. S. C. § 2000e-2(a). A separate section of the Act—its antiretaliation provision—prohibits an employer from “discriminat[ing] against” an employee or job applicant because that individual “opposed any practice” made unlawful by Title VII or “made a charge, testified, assisted, or participated in” a Title VII proceeding or investigation. § 2000e-3(a).
*57 The Courts of Appeals have come to different conclusions about the scope of the Act’s antiretaliation provision, particularly the reach of its phrase “discriminate against.” Does that provision confine actionable retaliation to activity that affects the terms and conditions of employment? And how harmful must the adverse actions be to fall within its scope?
We conclude that the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer’s actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.
I
A
This case arises out of actions that supervisors at petitioner Burlington Northern & Santa Fe Railway Company took against respondent Sheila White, the only woman working in the Maintenance of Way department at Burlington’s Tennessee Yard. In June 1997, Burlington’s roadmaster, Marvin Brown, interviewed White and expressed interest in her previous experience operating forklifts. Burlington hired White as a “track laborer,” a job that involves removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage from the right-of-way. Soon after White arrived on the job, a co-worker who had previously operated the forklift chose to assume other responsibilities. Brown immediately assigned White to operate the forklift. While she also performed some of the other track laborer tasks, operating the forklift was White’s primary responsibility.
*58 In September 1997, White complained to Burlington officials that her immediate supervisor, Bill Joiner, had repeatedly told her that women should not be working in the Maintenance of Way department. Joiner, White said, had also made insulting and inappropriate remarks to her in front of her male colleagues. After an internal investigation, Burlington suspended Joiner for 10 days and ordered him to attend a sexual-harassment training session.
On September 26, Brown told White about Joiner’s discipline. At the same time, he told White that he was removing her from forklift duty and assigning her to perform only standard track laborer tasks. Brown explained that the reassignment reflected co-workers’ complaints that, in fairness, a “‘more senior man’” should have the “less arduous and cleaner job” of forklift operator. 364 F. 3d 789, 792 (CA6 2004) (case below).
On October 10, White filed a complaint with the Equal Employment Opportunity Commission (EEOC or Commission). She claimed that the reassignment of her duties amounted to unlawful gender-based discrimination and retaliation for her having earlier complained about Joiner. In early December, White filed a second retaliation charge with the Commission, claiming that Brown had placed her under surveillance and was monitoring her daily activities. That charge was mailed to Brown on December 8.
A few days later, White and her immediate supervisor, Percy Sharkey, disagreed about which truck should transport White from one location to another. The specific facts of the disagreement are in dispute, but the upshot is that Sharkey told Brown later that afternoon that White had been insubordinate. Brown immediately suspended White without pay. White invoked internal grievance procedures. Those procedures led Burlington to conclude that White had not been insubordinate. Burlington reinstated White to her position and awarded her backpay for the 37 days she was *59 suspended. White filed an additional retaliation charge with the EEOC based on the suspension.
B
After exhausting administrative remedies, White filed this Title VII action against Burlington in federal court. As relevant here, she claimed that Burlington’s actions—(1) changing her job responsibilities, and (2) suspending her for 37 days without pay—amounted to unlawful retaliation in violation of Title VIL §2000e~3(a). A jury found in White’s favor on both of these claims. It awarded her $43,500 in compensatory damages, including $3,250 in medical expenses. The District Court denied Burlington’s post-trial motion for judgment as a matter of law. See Fed. Rule Civ. Proc. 50(b).
Initially, a divided Sixth Circuit panel reversed the judgment and found in Burlington’s favor on the retaliation claims. 310 F. 3d 443 (2002). The full Court of Appeals vacated the panel’s decision, however, and heard the matter en banc. The court then affirmed the District Court’s judgment in White’s favor on both retaliation claims. While all members of the en banc court voted to uphold the District Court’s judgment, they differed as to the proper standard to apply. Compare 364 F. 3d, at 795-800, with id., at 809 (Clay, J., concurring).
II
Title VIPs antiretaliation provision forbids employer actions that “discriminate against” an employee (or job applicant) because he has “opposed” a practice that Title VII forbids or has “made a charge, testified, assisted, or participated in” a Title VII “investigation, proceeding, or hearing.” §2000e-3(a). No one doubts that the term “discriminate against” refers to distinctions or differences in treatment that injure protected individuals. See Jackson v. Birmingham Bd. of Ed., 544 U. S. 167, 174 (2005); Price Water- *60 house v. Hopkins, 490 U. S. 228, 244 (1989) (plurality opinion); see also 4 Oxford English Dictionary 758 (2d ed. 1989) (def. 3b). But different Circuits have come to different conclusions about whether the challenged action has to be employment or workplace related and about how harmful that action must be to constitute retaliation.
Some Circuits have insisted upon a close relationship between the retaliatory action and employment. The Sixth Circuit majority in this case, for example, said that a plaintiff must show an “adverse employment action,” which it defined as a “materially adverse change in the terms and conditions” of employment. 364 F. 3d, at 795 (internal quotation marks omitted). The Sixth Circuit has thus joined those Courts of Appeals that apply the same standard for retaliation that they apply to a substantive discrimination offense, holding that the challenged action must “resul[t] in an adverse effect on the ‘terms, conditions, or benefits’ of employment.” Von Gunten v. Maryland, 243 F. 3d 858, 866 (CA4 2001); see Robinson v. Pittsburgh, 120 F. 3d 1286, 1300 (CA3 1997). The Fifth and the Eighth Circuits have adopted a more restrictive approach. They employ an “ultimate employment decision” standard, which limits actionable retaliatory conduct to acts “ ‘such as hiring, granting leave, discharging, promoting, and compensating.’” Mattern v. Eastman Kodak Co., 104 F. 3d 702, 707 (CA5 1997); see Manning v. Metropolitan Life Ins. Co., 127 F. 3d 686, 692 (CA8 1997).
Other Circuits have not so limited the scope of the provision. The Seventh and the District of Columbia Circuits have said that the plaintiff must show that the “employer’s challenged action would have been material to a reasonable employee,” which in contexts like the present one means that it would likely have “dissuaded a reasonable worker from making or supporting a charge of discrimination.” Washington v. Illinois Dept. of Revenue, 420 F. 3d 658, 662 (CA7 2005); see Rochon v. Gonzales, 438 F. 3d 1211, 1217-1218 (CADC 2006). And the Ninth Circuit, following EEOC *61 guidance, has said that the plaintiff must simply establish “‘adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.’” Ray v. Henderson, 217 F. 3d 1234, 1242-1243 (2000). The concurring judges below would have applied this last mentioned standard. 364 F. 3d, at 809 (opinion of Clay, J.).
We granted certiorari to resolve this disagreement. To do so requires us to decide whether Title VIPs antiretaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace. And we must characterize how harmful an act of retaliatory discrimination must be in order to fall within the provision’s scope.
A
Petitioner and the Solicitor General both argue that the Sixth Circuit is correct to require a link between the challenged retaliatory action and the terms, conditions, or status of employment. They note that Title VIPs substantive anti-discrimination provision protects an individual only from employment-related discrimination. They add that the anti-retaliation provision should be read in pari materia with the antidiscrimination provision. And they conclude that the employer actions prohibited by the antiretaliation provision should similarly be limited to conduct that “affects the employee’s ‘compensation, terms, conditions, or privileges of employment.’” Brief for United States as Amicus Curiae 13 (quoting § 2000e-2(a)(l)); see Brief for Petitioner 13 (same).
We cannot agree. The language of the substantive provision differs from that of the antiretaliation provision in important ways. Section 703(a) sets forth Title VIPs core antidiscrimination provision in the following terms:
“It shall be an unlawful employment practice for an employer—
*62 “(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin; or
“(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s race, color, religion, sex, or national origin.” §2000e-2(a) (emphasis added).
Section 704(a) sets forth Title VII’s antiretaliation provision in the following terms:
“It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.” § 2000e-3(a) (emphasis added).
The italicized words in the substantive provision—“hire,” “discharge,” “compensation, terms, conditions, or privileges of employment,” “employment opportunities,” and “status as an employee”—explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the antiretaliation provision. Given these linguistic differences, the question here is not whether identical or similar words should be read in pari materia to mean the same thing. See, e. g., Pasquantino v. United States, 544 U. S. 349, 355, n. 2 (2005); McFarland v. Scott, 512 U. S. 849, 858 (1994); Sullivan v. Everhart, 494 U. S. 83, 92 (1990). Rather, the question is whether Congress intended its different *63 words to make a legal difference. We normally presume that, where words differ as they differ here, “ ‘Congress acts intentionally and purposely in the disparate inclusion or exclusion.’ ” Russello v. United States, 464 U. S. 16, 23 (1983).
There is strong reason to believe that Congress intended the differences that its language suggests, for the two provisions differ not only in language but in purpose as well. The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. See McDonnell Douglas Corp. v. Green, 411 U. S. 792, 800-801 (1973). The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee’s efforts to secure or advance enforcement of the Act’s basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i. e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i. e., their conduct.
To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision’s basic objective of “equality of employment opportunities” and the elimination of practices that tend to bring about “stratified job environments,” id., at 800, would be achieved were all employment-related discrimination miraculously eliminated.
But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the antiretaliation provision’s objective would not be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. See, e. g., Rochon, 438 F. 3d, at 1213 (Federal Bureau of Investigation retaliation against employee “took the form of the FBI’s refusal, contrary to policy, to investigate death *64 threats a federal prisoner made against [the agent] and his wife”); Berry v. Stevinson Chevrolet, 74 F. 3d 980, 984, 986 (CA10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the antiretaliation provision’s “primary purpose,” namely, “Maintaining unfettered access to statutory remedial mechanisms.” Robinson v. Shell Oil Co., 519 U. S. 337, 346 (1997).
Thus, purpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. Cf. Wachovia Bank, N. A. v. Schmidt, 546 U. S. 303, 319 (2006) (rejecting statutory construction that would “[t]rea[t] venue and subject-matter jurisdiction prescriptions as in pari materia” because doing so would “o ver loo [k] the discrete offices of those concepts”).
Our precedent does not compel a contrary conclusion. Indeed, we have found no case in this Court that offers petitioner or the United States significant support. Burlington Industries, Inc. v. Ellerth, 524 U. S. 742 (1998), as petitioner notes, speaks of a Title VII requirement that violations involve “tangible employment action” such as “hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Id., at 761. But Ellerth does so only to “identify a class of [hostile work environment] cases” in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors. Id., at 760; see also Pennsylvania State Police v. Suders, 542 U. S. 129, 143 (2004) (explaining holdings in Ellerth and Faragher v. Boca Raton, 524 U. S. 775 (1998), as dividing hostile work environment claims into two categories, one in which the employer *65 is strictly liable because a tangible employment action is taken and one in which the employer can make an affirmative defense). Ellerth did not discuss the scope of the general antidiscrimination provision. See 524 U. S., at 761 (using “concept of a tangible employment action [that] appears in numerous cases in the Courts of Appeals” only “for resolution of the vicarious liability issue”). And Ellerth did not mention Title VII’s antiretaliation provision at all. At most, Ellerth sets forth a standard that petitioner and the Solicitor General believe the antiretaliation provision ought to contain. But it does not compel acceptance of their view.
Nor can we find significant support for their view in the EEOC’s interpretations of the provision. We concede that the EEOC stated in its 1991 and 1988 Compliance Manuals that the antiretaliation provision is limited to “adverse employment-related action.” 2 EEOC Compliance Manual § 614.1(d), p. 614-5 (1991) (hereinafter EEOC 1991 Manual); EEOC Compliance Manual § 614.1(d), p. 614-5 (1988) (hereinafter EEOC 1988 Manual). But in those same manuals the EEOC lists the “[e]ssential [elements” of a retaliation claim along with language suggesting a broader interpretation. EEOC 1991 Manual § 614.3(d), pp. 614-8 to 614-9 (complainant must show “that (s)he was in some manner subjected to adverse treatment by the respondent because of the protest or opposition”); EEOC 1988 Manual § 614.3(d), pp. 614-8 to 614-9 (same).
Moreover, both before and after publication of the 1991 and 1988 manuals, the EEOC similarly expressed a broad interpretation of the antiretaliation provision. Compare EEOC Interpretive Manual, Reference Manual to Title VII Law for Compliance Personnel §491.2 (1972) (hereinafter 1972 Reference Manual) (§ 704(a) “is intended to provide ‘exceptionally broad protection’ for protestors of discriminatory employment practices”), with 2 EEOC Compliance Manual § 8, p. 8-13 (1998) (hereinafter EEOC 1998 Manual), available at http://www.eeoc.gov/policy/docs/retal.html (as *66 visited June 20, 2006, and available in Clerk of Court’s case file) (§ 704(a) “prohibits] any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity”). And the EEOC 1998 Manual, which offers the Commission’s only direct statement on the question of whether the antiretaliation provision is limited to the same employment-related activity covered by the antidiscrimination provision, answers that question in the negative—directly contrary to petitioner’s reading of the Act. Ibid.
Finally, we do not accept petitioner’s and the Solicitor General’s view that it is “anomalous” to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination. Brief for Petitioner 17; Brief for United States as Amicus Curiae 14-15. Congress has provided similar kinds of protection from retaliation in comparable statutes without any judicial suggestion that those provisions are limited to the conduct prohibited by the primary substantive provisions. The National Labor Relations Act, to which this Court has “drawn analogies ... in other Title VII contexts,” Hishon v. King & Spalding, 467 U. S. 69, 76, n. 8 (1984), provides an illustrative example. Compare 29 U. S. C. § 158(a)(3) (substantive provision prohibiting employer “discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization”) with § 158(a)(4) (retaliation provision making it unlawful for an employer to “discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter”); see also Bill Johnson’s Restaurants, Inc. v. NLRB, 461 U. S. 731, 740 (1983) (construing antiretaliation provision to “prohibit] a wide variety of employer conduct that is intended to restrain, or that has the likely effect of restraining, employees *67 in the exercise of protected activities,” including the retaliatory filing of a lawsuit against an employee); NLRB v. Scrivener, 405 U. S. 117, 121-122 (1972) (purpose of the anti-retaliation provision is to ensure that employees are “ ‘completely free from coercion against reporting’” unlawful practices).
In any event, as we have explained, differences in the purpose of the two provisions remove any perceived “anomaly,” for they justify this difference of interpretation. See supra, at 63-64. Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. “Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.” Mitchell v. Robert DeMario Jewelry, Inc., 361 U. S. 288, 292 (1960). Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act’s primary objective depends.
For these reasons, we conclude that Title VII’s substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called “ultimate employment decisions.” See supra, at 60.
B
The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. *68 In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, “which in this context means it well might have ‘dissuaded a reasonable worker from making or supporting a charge of discrimination.’ ” Rochon, 438 F. 3d, at 1219 (quoting Washington, 420 F. 3d, at 662).
We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth “a general civility code for the American workplace.” Oncale v. Sundowner Offshore Services, Inc., 523 U. S. 75, 80 (1998); see Faragher, 524 U. S., at 788 (judicial standards for sexual harassment must “filter out complaints attacking ‘the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing’”). An employee’s decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that “courts have held that personality conflicts at work that generate antipathy” and “‘snubbing’ by supervisors and co-workers” are not actionable under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with “unfettered access” to Title VII’s remedial mechanisms. Robinson, 519 U. S., at 346. It does so by prohibiting employer actions that are likely “to deter victims of discrimination from complaining to the EEOC,” the courts, and their employers. Ibid. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p. 8-13.
We refer to reactions of a reasonable employee because we believe that the provision’s standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plain *69 tiff’s unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here. See, e. g., Suders, 542 U. S., at 141 (constructive discharge doctrine); Harris v. Forklift Systems, Inc., 510 U. S. 17, 21 (1993) (hostile work environment doctrine).
We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. “The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.” Oncale, supra, at 81-82. A schedule change in an employee’s work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. Cf., e. g., Washington, supra, at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor’s refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee’s professional advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an “act that would be immaterial in some situations is material in others.” Washington, supra, at 661.
Finally, we note that contrary to the claim of the concurrence, this standard does not require a reviewing court or jury to consider “the nature of the discrimination that led to the filing of the charge.” Post, at 78 (Alito, J., concurring in judgment). Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and the perspective of a reason *70 able person in the plaintiff’s position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.
Ill
Applying this standard to the facts of this case, we believe that there was a sufficient evidentiary basis to support the jury’s verdict on White’s retaliation claim. See Reeves v. Sanderson Plumbing Products, Inc., 530 U. S. 133, 150-151 (2000). The jury found that two of Burlington’s actions amounted to retaliation: the reassignment of White from forklift duty to standard track laborer tasks and the 37-day suspension without pay.
Burlington does not question the jury’s determination that the motivation for these acts was retaliatory. But it does question the statutory significance of the harm these acts caused. The District Court instructed the jury to determine whether respondent “suffered a materially adverse change in the terms or conditions of her employment,” App. 63, and the Sixth Circuit upheld the jury’s finding based on that same stringent interpretation of the antiretaliation provision (the interpretation that limits §704 to the same employment-related conduct forbidden by § 703). Our holding today makes clear that the jury was not required to find that the challenged actions were related to the terms or conditions of employment. And insofar as the jury also found that the actions were “materially adverse,” its findings are adequately supported.
First, Burlington argues that a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description. Brief for Petitioner 24-25. We do not see why that is so. Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage *71 an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found “[Retaliatory work assignments” to be a classic and “widely recognized” example of “forbidden retaliation.” 2 EEOC 1991 Manual § 614.7, pp. 614-31 to 614-32; see also 1972 Reference Manual § 495.2 (noting Commission decision involving an employer’s ordering an employee “to do an unpleasant work assignment in retaliation” for filing racial discrimination complaint); Dec. No. 74-77, CCH EEOC Decisions (1983) ¶ 6417 (1974) (“Employers have been enjoined” under Title VII “from imposing unpleasant work assignments upon an employee for filing charges”).
To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and “should be judged from the perspective of a reasonable person in the plaintiff’s position, considering ‘all the circumstances.’” Oncale, 523 U. S., at 81. But. here, the jury had before it considerable evidence that the track laborer duties were “by all accounts more arduous and dirtier”; that the “forklift operator position required more qualifications, which is an indication of prestige”; and that “the forklift operator position was objectively considered a better job and the male employees resented White for occupying it.” 364 F. 3d, at 803 (internal quotation marks omitted). Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.
Second, Burlington argues that the 37-day suspension without pay lacked statutory significance because Burlington ultimately reinstated White with backpay. Burlington says that “it defies reason to believe that Congress would have considered a rescinded investigatory suspension with full *72 back pay” to be unlawful, particularly because Title VII, throughout much of its history, provided no relief in an equitable action for victims in White’s position. Brief for Petitioner 36.
We do not find Burlington’s last mentioned reference to the nature of Title VII’s remedies convincing. After all, throughout its history, Title VII has provided for injunctions to “bar like discrimination in the future,” Albemarle Paper Co. v. Moody, 422 U. S. 405, 418 (1975) (internal quotation marks omitted), an important form of relief. Pub. L. 88-352, § 706(g), 78 Stat. 261, as amended, 42 U. S. C. § 2000e-5(g). And we have no reason to believe that a court could not have issued an injunction where an employer suspended an employee for retaliatory purposes, even if that employer later provided backpay. In any event, Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover compensatory (as White received here) and punitive damages, concluding that the additional remedies were necessary to “‘help make victims whole.’” West v. Gibson, 527 U. S. 212, 219 (1999) (citing H. R. Rep. No. 102-40, pt. 1, pp. 64-65 (1991)); see 42 U. S. C. §§ 1981a(a)(1), (b). We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances. .
Neither do we find convincing any claim of insufficient evidence. White did receive backpay. But White and her family had to live for 37 days without income. They did not know during that time whether or when White could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having “no income, no money” in fact caused. Brief for Respondent 4, n. 13 (“ ‘That was the worst Christmas I had out of my life. No income, no money, and that made all of us feel bad.... I got very depressed’ ”). Indeed, she obtained medical treatment for her emotional distress. *73 A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay. Cf. Mitchell, 361 U. S., at 292 (“[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions”). Thus, the jury’s conclusion that the 37-day suspension without pay was materially adverse was a reasonable one.
IV
For these reasons, the judgment of the Court of Appeals is affirmed.

It is so ordered.