**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1237
_____

MAURICE BURTON,

Appellant

v.

PENNSYLVANIA STATE POLICE;
KATHY JO WINTERBOTTOM
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 1-11-cv-01968)
District Judge:  Hon. Sylvia H. Rambo
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 15, 2015

Before:  AMBRO, FUENTES, and ROTH, *Circuit Judges*

(Filed: May 18, 2015)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*:

Maurice Burton, a former corporal in the Pennsylvania State Police (the "Police"), appeals the District Court's grant of summary judgment in favor of the Police and Kathy Jo Winterbottom, a Police lieutenant. We affirm.

I.

Burton worked as a trooper and then corporal supervisor in the Police's Bureau of Research and Development (the "Bureau"). Beginning in 2007, several of Burton's supervisors noticed that he was spending an extraordinary amount of time at work— sometimes two to four hours a day—with Pamela Yandrich, who was employed as the e-library administrator. Burton's supervisors initially addressed the issue informally. This became a significant problem in maintaining the discipline and effectiveness of the Police's work environment. The real problem, Burton claims, was that he and Yandrich were of mixed raced—Burton black and Yandrich white. Indeed, Burton interpreted comments made to him by his colleagues, including an African-American colleague, as threats based on race rather than attempts to stop excessive worktime fraternization.

In early 2008, Burton began the process of testing for the rank of sergeant. Upon learning that Lieutenant Walter Margeson was assigned to score the oral portion of the exam, Burton objected, believing that Margeson held a negative view of him because of his relationship with Yandrich. Burton eventually elected to keep Margeson on the panel and have a consultant examine the test results. While candidates must score in the top 100 to be

eligible for sergeant, Burton's test scores ranked 244 out of 476. Consequently, he was not promoted.

Burton remained in his position as corporal supervisor where, despite repeated informal reprimands, he continued to spend much worktime conversing with Yandrich. In November 2008, after observing the two talking for over seven hours in two days, Lieutenant Carl Harrison (himself an African-American) issued supervisor's notations to both Burton and Yandrich. A supervisor's notation is a disciplinary measure used by the Police that is placed in an employee's personnel files for six months. If no further issue arises during those six months, the notation is removed from the files.

A few weeks later, at the Bureau's holiday party, Lieutenant Richard Stein approached Corporal Jack Reese and asked him whether he would be interested in taking Burton's position. Reese declined the offer and later informed Burton about his conversation with Stein. Also in December 2008, Harrison asked Burton to cover the upcoming Pennsylvania Farm Show, an assignment that Burton found insulting in light of his supervisory position in the Bureau. After Burton complained about the assignment, Harrison responded that the Bureau was short-staffed and that the "Farm Show Detail calls for Trooper/Corporal assignment. You are a Corporal . . . and can be assigned as needed. . . . By your logic, any assignment given that you are not in agreement with would be retaliation." App. 699-700.

In January 2009, Burton met with Captain Martin Henry III, the Equal Employment Opportunity director for the Police. During their meeting, Burton advised Henry of his

3

recent treatment at the Bureau and his belief that the various incidents were racially motivated. In addition, Burton told Henry that Stein had made inappropriate sexual comments in the office. Following this meeting, the Police initiated a formal investigation into these allegations led by Lieutenant Winterbottom. In connection with her investigation, Winterbottom interviewed all relevant personnel, including Burton, Yandrich, and Stein. Based on her report, the Police initially determined that the allegations were unfounded as to disparate treatment but sustained as to Stein's inappropriate comments.

After further review, however, Major John Laufer concluded that the charge against Stein was not sustained because Burton and Yandrich had credibility issues and were less than truthful in their interviews. The Police then conducted a supplemental investigation into Burton, believing that he may have committed infractions. Following this additional investigation, the Police concluded that Burton discussed the sexual comments attributed to Stein with two subordinates, made an inappropriate sexual remark himself, and was not truthful when questioned about reading a confidential correspondence that he was not authorized to read. As a result of these infractions, Burton was suspended for two days without pay.

Burton remained at the Bureau until he retired in July 2011, five years short of full retirement. After he left, Burton sued the Police and Winterbottom asserting claims for discrimination, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Pennsylvania Human Relations

4

Act, 43 Pa. Stat. § 951 *et seq.*; and 42 U.S.C. § 1983.  In an exhaustive decision, the District Court granted summary judgment for the Police and Winterbottom.[1]

## II.

## A.

We begin our analysis with Burton's discrimination claims.  Under the *McDonnell Douglas* framework, the employee bears the initial burden of establishing a prima facie case of discrimination by showing, among other things, that he suffered an adverse employment action occurring under circumstances that could give rise to an inference of discrimination.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Once the employee satisfies these elements, the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action.  *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009).  If the employer is able to provide such a reason, the burden of production shifts back to the employee to demonstrate that the proffered rationale was a pretext for discrimination.  *Id.*

Burton alleges that the Police discriminated against him on the basis of race by issuing him a supervisor's notation, failing to promote him to sergeant, and suspending him

---

[1] The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. Our jurisdiction is based on 28 U.S.C. § 1291.  We exercise plenary review over the District Court's grant of summary judgment and will affirm only if, "viewing the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion, we conclude that a reasonable jury could not rule for the nonmoving party." *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448 (3d Cir. 2015) (internal quotation marks and citations omitted).  We apply the same standards to the claims under Title VII and the Pennsylvania Human Relations Act. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d

without pay. We agree with the District Court that Burton has not established a prima facie case of discrimination and that, even if he had, the Police has offered legitimate, non-discriminatory justifications for its actions.

As to the supervisor's notation, there was no adverse employment action because the notation, which is placed in an employee's files for six months, did not materially change the terms or conditions of Burtons's employment. *See Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) (explaining that temporary reprimands not permanently affixed to an employee's file do not alter the employee's status), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In any event, the Police has offered a non-discriminatory reason for its actions. Notwithstanding repeated warnings from his supervisors, Burton continued to spend an inordinate amount of time socializing with Yandrich while at work. As the District Court found, "[i]t speaks for itself that an employer has a strong interest in ensuring a certain level of conduct and productivity within the office." *Burton v. Pa. State Police*, 990 F. Supp. 2d 478, 504 (M.D. Pa. 2014). Other than his self-serving statements to the contrary, Burton has not shown that the Police's explanation was pretextual.

Burton similarly fails to support his claim that the Police did not promote him to sergeant because of discriminatory animus. He does not dispute that his test scores alone—ranking 244 out of 476—disqualified him from eligibility for promotion.

Burton maintains that the investigation that resulted in his two-day suspension was

561, 567 (3d Cir. 2002).

racially motivated. He points out that he was the only African-American among a group of employees who made inappropriate sexual comments and he was the only one subject to investigation. However, he ignores that the supplemental investigation arose during the course of investigating Burton's complaints about Stein's alleged transgressions. During that initial investigation, the Police learned of several infractions committed by Burton. Moreover, Burton acknowledges that he was suspended for violating several Police field regulations and he has not put forth evidence of similarly situated employees receiving less severe punishments.

B.

We next turn to Burton's retaliation claims. To establish a prima facie case of retaliation, an employee must demonstrate that (1) he engaged in protected activity, (2) his employer took adverse employment action against him, and (3) there was a causal connection between the protected activity and the adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). We find that Burton has not shown a prima facie case of retaliation and, moreover, the Police has articulated non-discriminatory reasons for its actions.

Burton appears to argue that he received a supervisor's notation in retaliation for complaining to Harrison and Stein that he was being unfairly targeted for his relationship with Yandrich. This argument fails for the same reasons discussed above in connection with his discrimination claim.

Burton suggests that the Police retaliated against him by threatening him and

7

attempting to remove him from the Bureau. Specifically, a statement by Stein that "I'd hate to see you leave, though you do good work" was a "clear threat." Stein then attempted to replace Burton at the holiday party by offering his position to someone else. But neither Stein's comment nor the attempt to replace Burton qualifies as an adverse employment action. And even if they did, Burton offers nothing to rebut the Police's non-discriminatory reason for these actions, namely, his excessive socializing.

He maintains that his assignment to cover the Farm Show, which was "beneath his position," was an act of retaliation. However, the director of the Bureau testified that both troopers and corporal supervisors could be tasked with covering the Farm Show. Burton offers no rebuttal to this point. At most, the four-day assignment was a "petty slight[] or minor annoyance[]" that does not rise to the level of a material adverse employment action. *Moore*, 461 F.3d at 346.

Burton alleges that the Police retaliated against him by making him the subject of an investigation. For reasons similar to those discussed above, we reject this argument.

Finally, Burton asserts that Winterbottom retaliated against him for exercising his First Amendment right to freedom of association. In his view, as a public employee, his relationship with Yandrich was protected activity. Notwithstanding much of it occurred during work hours and interfered with their official duties, Burton cites no authority for the proposition that work friendships are a constitutionally protected association. Moreover, Winterbottom's investigations arose as a result of Burton complaining to the Police's Equal Employment Opportunity director, not because of his relationship with Yandrich.

8

## C.

Arguing he "had no choice but to resign" in 2011, Burton asserts a claim for constructive discharge. To establish this claim, an employee must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (internal quotation marks omitted).

There is no evidence in the record to support constructive discharge. Many of the incidents about which Burton complains occurred several years before he resigned. Nor were the incidents he describes the result of discrimination. Burton was censured and disciplined because of his excessive socializing with Yandrich in the office. Furthermore, many of Burton's allegations of mistreatment target Harrison and Stein, but they both left the Bureau well before Burton did—Stein in early 2009 and Harrison in July 2010.

## III.

For the foregoing reasons, we affirm the District Court's order.