JAMES L. DENNIS, Circuit Judge,
dissenting:
Because the majority affirms summary judgment for the defendant in this case by erroneously construing some of the plaintiffs evidence against him and by expressly disregarding other of his evidence, I respectfully dissent.
I.
Daniel Valderaz, a former hospital nurse, claims that his female coworkers made a number of remarks to him that were sexual in nature. He also says that they questioned his ability, as a man, to work as a pediatric nurse and refused to cooperate in performing nursing services with him. Believing these comments and actions to be sex discrimination that was detrimental to his job performance and the safety of his patients, he reported their conduct to hospital supervisors. On April 11, 2011, Valderaz met with the hospital’s HR director, Kanice Newton, to discuss his discrimination complaint. Also present at the meeting were several other hospital representatives, and Valderaz’s wife came with him. This is what Valderaz attests, in his affidavit, happened at the meeting (there is also an affidavit in the record from Valderaz’s wife corroborating the account):
Ms. Newton, instead of stating that she would take steps to correct the problems I was having, instead, suggested that I transfer out of PICU [the Pediatric Intensive Care Unit] into another department. In doing so, she explicitly and clearly told me that there were nursing positions available for me to transfer out of the department and that all I needed to do was to choose one and I would be transferred to that department. I was spe *825 cifically told by Ms. Newton that I was transferring, not that I was resigning and applying for a job in another department. In fact, she stated that she was making an exception for me to do that. I agreed to the transfer based upon the specific statements made by Ms. Newton, the Human Resources Director, that it was, in fact, a transfer. I told her that I could not afford to lose my job because of a number of reasons and she assured me that I was not losing my job but was simply making a transfer to an existing position. I did not misunderstand what the Human Resources Director told me, and I relied upon her representations in agreeing to transfer. She then told me to report to the recruiting office to begin the transfer process. When I arrived at the recruiting office, it was closed. I went home and called the recruiting office. At that time, I was told there was not another position available and that my employment had, in fact, been terminated. I believe the transfer was a ruse to induce me to leave my position in PICU.
In his deposition testimony, Valderaz clarifies what he means in saying that his “employment was términated.” Although he didn’t know it immediately after the April 11 meeting, his employment at the hospital was not terminated in whole. Rather, his employment as a full-time nurse ended, and he was transferred to “on-call” status at the hospital. When he was a full-time nurse, he had insurance and retirement benefits; as an on-call employee, he did not. As an on-call employee, he did not work full-time, but only as needed. If he wanted to return to his status as a full-time employee with benefits, he would have had to apply for an open position and be accepted, just as any outside applicant would, and he would not be guaranteed a position. Valderaz says that there was no discussion of his on-call status change during either the April 11 meeting or the subsequent conversation with the recruiting office. He states that during the April 11 meeting he was promised a transfer to an equivalent position as a full-time nurse, but that after the meeting he was told by the recruiting office that his position was terminated. He states that he was not aware until sometime later that the hospital had not fired him in whole, but had reclassified him as an on-call nurse.[1]
In short, Valderaz’s contention is that, in his meeting with HR to discuss his complaint of sex discrimination, the hospital, in direct response to his complaint, promised him a transfer to an equivalent job; then, for no stated reason, the hospital reneged on its promise.[2] It did not transfer him to an equivalent job, but it reclassified him to continue working on an “as-needed” basis, without the full-time pay or benefits he formerly had, and told him that if he wanted full-time work again, he would have to apply for it and compete with all other applicants on an equal footing.
To support a 'prima facie claim of retaliation under Title VII, the plaintiff must show that “(i) he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action.” Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 657 *826 (5th Cir.2012). In my view, those elements are met here.
First, there is no question that Valder-az’s reports to hospital supervisors of what he believed to be sex discrimination was protected activity. I agree with the majority on this point. See ante, at 820-21.
Second, it is an uncontroversial conclusion that an adverse employment action occurred. An adverse employment action is employer conduct that “well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted). After Val-deraz complained about sex discrimination, he lost his status, salary, and benefits as a full-time employee. Such a loss of status, salary, and benefits would dissuade a .reasonable worker from making a charge of discrimination.
Third, it is equally clear that Valderaz’s deposition and affidavit testimony supports a causal link between his complaint of sex discrimination and the adverse employment action. Valderaz testifies that the hospital made its false promise of a transfer, on which it later reneged, when meeting with him to discuss his discrimination complaint. The false promise of a transfer and the corresponding diminishment of employment status, salary, and benefits, in other words, was the hospital’s immediate and direct response to Valderaz’s discrimination complaint. If such an immediate and direct response to a discrimination complaint does not constitute a causal link, then nothing does.[3]
Because Valderaz’s evidence suffices for a prima facie case of retaliation, the burden shifts to the hospital “to provide a legitimate, non-retaliatory reason for the adverse employment action.” Hernandez, 670 F.3d at 657 (internal quotation marks and citation omitted). The hospital has satisfied that burden. Simply stated, its witnesses dispute Valderaz’s testimony about the April 11 meeting. Valderaz was never promised any other position, the hospital’s witnesses maintain. According to them, Valderaz resigned from his full-time job of his own volition. There was simply no retaliation, the hospital contends, but only a voluntary resignation.
Now, the question is whether Valderaz’s evidence creates a genuine dispute as to whether the hospital terminated his full-time employment against his will and as a result of his discrimination complaint. See Hernandez, 670 F.3d at 657. I think that *827 it does. This case comes down to dueling testimony. Valderaz’s testimony, corroborated by his wife’s, is that the hospital, in direct response to his discrimination complaint, made a false promise to him that it did not keep and instead terminated his full-time employment, leaving him with lesser status, salary, and benefits. The hospital counters with testimony that no such thing happened. Therefore, it falls to the jury to listen to the witnesses, believe whom it will, and rule accordingly. See Harvill v. Westward Commc’ns, L.L.C., 433 F.3d 428, 436 (5th Cir.2005) (the court cannot make credibility determinations or weigh any evidence on a summary judgment motion). Valderaz is entitled to a trial, and we should therefore'reverse the district court’s summary judgment and remand for such.
II.
Respectfully, the majority’s stated reasons for denying Valderaz’s retaliation claim, which I will now address, are erroneous.
A.
First, the majority states in a footnote that it disregards Valderaz’s affidavit (and apparently his wife’s corroborative affidavit, too) because the affidavit “contrasts with” Valderaz’s prior deposition testimony. Ante, at 823-24 n. 6. The majority explains:
At his deposition, Valderaz acknowledges that his decision not to return to the PICU was not dependent upon any promise that he be transferred to another job with the hospital. Valder-az testified that the reason he did not go back was because of the perceived hostile work environment. That was his testimony, and his later filed affidavit should not be relied upon, to defeat summary judgment.
Id. (emphasis in original). If Valderaz truly testified at his deposition that he chose to leave his job irrespective of any promise of a transfer to another position, then such testimony would indeed conflict (or at least be in tension) with the affidavit. However, as I read Valderaz’s deposition, he did not so testify. The deposition testimony shows the majority’s misunderstanding of it:
Q. Did you ever make a determination that you were not going back to work in the PICU?
A. I informed Mrs. Newton that the environment was so hostile and so inappropriate and not conducive to the care of critically ill pediatric patients that it was an unsafe environment for me to practice, that it would possibly cause an adverse effect or event to a pediatric patient which would then cause an adverse effect to my licensure and career and employment, that I was not receiving appropriate support for pediatric patients for the care and the requirements involved. That the most comfortable way for me to go back to work is to receive the tools, the equipment, the personnel, the support and the education to effectively care for pediatric intensively ill children.
Q. Okay. But my question was, did you make a determination “I’m not going back there”?
A. Based on that criteria.
Q. And when did you make that determination?
A. ' With a meeting with Mrs. Newton.
Q. And I believe that was on April 11th....
A. Yes, sir.
Q. ... [T]hat determination was not based on having an alternative *828 place to go, it was a determination made that “I’m not going back there under any circumstances,” correct?
A. The determination was that it was an unsafe environment to practice nursing.
Q. And you made that determination you were not going back into that?
A. That unless the situation, that the unsafe situation was resolved, in an effective manner for me to practice in a safe environment, that is correct.
Q. Okay. So your decision on April 11th not to go back was not dependent upon any promise that you be transferred someplace else, it was based on your feeling that that was not a place that you could thrive and not a place you could be safe and not a place that you were going to take the risk of going back to, correct?
A. Unless the situation was — the hostile work environment situation was resolved.
Clearly, the hospital’s attorney repeatedly attempted to elicit testimony from Valderaz that he wouldn’t continue working in his department under any circumstances and that such decision was made irrespective of any promise to transfer to another department, but Valderaz never gave such testimony. The majority’s statement that Valderaz testified to leaving his department based entirely on perceived hostility and irrespective of any promise to transfer to another department is clear error. (Notably, the majority doesn’t quote any actual deposition testimony to that effect. There is none.) Instead, Valderaz testified that he would continue working in his department if the hostile environment (what he perceived to be a hostile environment, that is) were resolved. And that testimony is entirely consistent with his affidavit attesting that he agreed to transfer to a different department based upon the hospital’s promise that he would actually be given such a transfer. In fact, immediately after this part of the deposition, Valderaz proceeded to testify, consistent with the affidavit, that the hospital promised him a transfer during the April 11 meeting, e.g.:
Q. You allege that you were promised that you would be transferred?
A. Absolutely.
There is, in short, no conflict between Valderaz’s deposition testimony and his affidavit. Both the deposition and the affidavit tell the same story, viz.: Valderaz informed the hospital that he didn’t want to continue working in his current department unless the environment in the department changed, the hospital responded by promising to transfer him to another department, and he agreed to the hospital’s offer of a transfer, but then the hospital reneged on that offer, thus leaving him without a full-time job.
The rules of summary judgment require that we credit this evidence of Valderaz, the nonmovant, as the Supreme Court has recently reminded us. Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam), summarily rev’g 713 F.3d 299 (5th Cir.2013). With due respect to the majority, its decision to construe Valderaz’s deposition testimony against him, mistakenly perceiving a conflict where there is none, and using that erroneous construction as a basis for wholly excluding his affidavit — and apparently his wife’s affidavit, also — from consideration is plain error. The Supreme Court told us in Tolan that it intervened in that case because this court’s opinion reflected “a clear misapprehension of summary judgment standards.” Id. at 1868. It is *829 unfortunate that the same can be said here.
B.
Second, there is no evidence, the majority says, that Valderaz “was terminated immediately after the April 11 meeting.” Ante, at 823-24. According to the majority, the evidence “irrefutably” shows that he was terminated later, “weeks after having been placed as an on-call status employee.” Id. at 824. Respectfully, the majority misconstrues Valderaz’s claim and the relevant evidence. When Valderaz says that his employment was “terminated” after the April 11 meeting, what he means is that his status as a full-time employee was terminated after the meeting. See Valderaz’s Br., at 14 (“Valderaz was tricked into terminating his full time employment by being told by [hospital] representatives that he was not resigning his job but was, instead, simply transferring to a new department.”) (emphasis added).[4] And there is no dispute — the parties agree — that Valderaz’s full-time employment ended after the April 11 meeting. The only dispute is whether it ended as a result of Valderaz’s voluntary choice (as the hospital claims) or not (as Valderaz claims). In short, Valderaz’s full-time employment ended after the April 11 meeting, and his retaliation claim focuses on that undisputed fact. The majority has ignored Valderaz’s actual claim and instead denied another claim that is not asserted.
C.
Third, the majority discusses Valderaz’s attempts to find another job at the hospital and his “lack of diligence” in doing so. Ante, at 823-24. Here, the majority entirely misses the point. As I explained, Valderaz’s claim of retaliation focuses on the loss of his status, salary, and benefits as a full-time employee. His efforts toward finding another job after he lost full-time employment are irrelevant.
In sum, the majority presents no valid reason for denying Valderaz his day in court. Properly understood, his claim of retaliation is supported by sufficient evidence, and he has the right to have a jury assess it. I respectfully dissent from the majority’s denial of that right.

. The record contains a hospital form reflecting Valderaz's on-call status change on April 25, 2011. Another hospital form in the record reflects the complete termination of Val-deraz's employment on June 24, 2011.

. The hospital does not deny that Newton, its HR director, had authority to act on its behalf in personnel matters such as Valderaz’s.

. The majority finds causation present here because fewer than four months elapsed between when Valderaz first complained about sex discrimination to hospital supervisors (March 2, 2011) and when his employment was terminated (which the majority concludes was June 24, 2011, based on the hospital's documentary evidence). Ante, at 822-23. This is a puzzling and unnecessary analysis. There are some cases where the only evidence of a causal link between the employee’s complaint of discrimination and some subsequent adverse employment action is the circumstantial fact that only a short period of time passed between the two events. But this is not such a case. Here, the employee and the employer had a conversation about the employee’s claim that he was a victim of discrimination, and, in that conversation and in direct response to the employee, the employer committed part of the alleged adverse employment action — i.e., the false promise of a transfer. Causation is present because the hospital’s conduct was unambiguously responsive, and directly so, to Valderaz’s charge of discrimination. Cf, e.g., Loveless v. John’s Ford, Inc., 232 Fed.Appx. 229, 234 (4th Cir.2007) (unpublished) (rejecting employer's argument as to an “insufficient nexus" when employer made derogatory comments in direct response to the employee's question of “why me?”). There is therefore no need in this case to search for causation buried in circumstantial evidence.

. See also the following excerpt from Valder-az’s deposition:
Q. Was there any discussion [during the April 11 meeting] about you remaining on call ... ?
A. No, there was no discussion. I actually found that out after the fact, and I was then terminated a second time for not—
Q. You got terminated twice? You got terminated even after you had been terminated?
A. I was terminated from UMC [University Medical Center hospital] a [sic ] full-time position. And I did not know — that had benefits and had retirement and had insurance. And then I was then told that I had a [part-time] position that had no benefits, had no secure employment, was just an as-needed position that — that was still there. And I had no idea, nobody had told me.
This exchange makes clear that in Valder-az’s terminology, there were two so-called "terminations.” The first "termination” — the one that is the focus of this case — was during and after the April 11 meeting, when he was switched from full-time work to on-call status. The second "termination” was weeks later when he was no longer employed by the hospital in any manner.