**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1051
_____

GLORIA MCKINNEY,
                              Appellant

v.

HACKENSACK MERIDIAN HEALTH, INC.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-16-cv-04139)
District Judge:  Honorable Peter G. Sheridan
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 3, 2018

Before:  JORDAN, RESTREPO, and SCIRICA, <u>Circuit</u> <u>Judges</u>

(Opinion filed: October 18, 2018)
_____

OPINION[*]
_____

PER CURIAM

       Gloria McKinney appeals from an order of the United States District Court for the

District of New Jersey, which granted summary judgment to Hackensack Meridian

_____
[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Health, Inc. ("Meridian"), her employer at the time of the complaint. We will affirm the District Court's judgment.

I.

Because we write primarily for the parties, we discuss the background of this case only to the extent needed to resolve this appeal. McKinney, who is Black and 64 years old, began working for Meridian Nursing & Rehab at Bayshore ("Bayshore") in 1999 as a Nutritional Services Supervisor. McKinney alleges that she was hired for the opening shift (starting between 5:30 a.m. and 6:30 a.m., and finishing between 2:00 p.m. and 3:00 p.m.). Meridian acquired Bayshore in 2011.[1] In April 2013, Laura Perez, Bayshore's Director of Nutritional Services and McKinney's direct supervisor, and William Hamilton, then Assistant Administrator, decided to require all Nutritional Services Supervisors to take turns working the opening shift and the closing shift (closing starts around 11:30 a.m. and ends around 8:00 p.m.).

Perez met with McKinney to explain the decision and McKinney objected, since she had always worked only the opening shift. McKinney also complained that people doing the closing shift were not doing their jobs and that McKinney would have to pick up the slack the next morning. Perez replied "that's your nature," which McKinney took

---

[1] Unless otherwise specified in this opinion, our references to "Bayshore" refer to that entity after it was acquired by Meridian.

as an insult.[2]  McKinney met with Hamilton to complain about the decision, and Hamilton brought Perez into the meeting.  Perez then apologized to McKinney in case she had said anything that had offended her.  But McKinney remained upset and told them that they were making the decision because she is Black.

McKinney sent a report to a Meridian Team Member Relations Specialist, Claudia Myers, indicating that Perez told her, "Gloria you are the opening supervisor, now you will be the closing supervisor."  Myers investigated, and learned that McKinney was not the only closing supervisor; in May and June 2013, Caucasian supervisor David diGiacomo was scheduled to work four closing shifts each week, Hispanic supervisor Yolanda Torres was scheduled to work two closing shifts each week, and McKinney also was scheduled to work two closing shifts each week.  Myers explained to McKinney that her co-worker Fern Collins was not required to close because she was the Assistant Director of Nutritional Services, rather than a Nutritional Services Supervisor.

McKinney's complaint also mentioned an incident in July 2015, when a patient with seafood allergies was erroneously served clam chowder.  Because it was McKinney's duty to check the patient trays to ensure patients received the proper food, McKinney was called into a meeting with Hamilton, Perez, and Director of Nursing Beverly Osbourne.  McKinney denied that she had made a mistake and told Hamilton that she was being picked on because she is Black.  McKinney alleges that Hamilton then

---

[2] We are hard pressed to understand how being told that it is "in your nature" to pick up the slack for other employees is an insult, much less a racially-charged insult.

launched out of his seat, pointed his finger at her, and said, "Don't go there!" When the meeting concluded, Hamilton contacted Human Resources, and Team Member Relations Manager Brad Viola investigated with the assistance of Myers.

McKinney told investigators that she was treated differently than Collins, who had also made a mistake by providing mushroom soup to a patient with a mushroom allergy, but investigators learned that Perez had similarly spoken to Collins when that problem occurred. McKinney also told investigators that white supervisors were assigned fewer closing shifts and that Perez had refused to allow her to take vacation. The investigators learned that McKinney was not assigned to more closing shifts than others of a different race, and that she was not refused vacation, but was asked to schedule for a different time because of an upcoming State inspection.

Throughout the period in question, McKinney received good performance reviews and received annual salary increases. She was never formally disciplined for any mistakes.

## II.

In July 2015, McKinney filed charges with the United States Equal Employment Opportunity Commission ("EEOC"), but after investigation, it was "unable to conclude that the information obtained establishes violations of the statutes" enforced by the EEOC. The EEOC dismissed the matter and issued McKinney a "right to sue" notice.

4

McKinney then filed her complaint in the District Court. The Defendants[3] filed a motion to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The District Court granted the motion to dismiss the case as to the individual defendants, and granted the motion to dismiss the complaint against Bayshore without prejudice to McKinney filing an amended complaint.[4]

McKinney timely filed an amended complaint. Bayshore filed another Rule 12(b)(6) motion. The District Court granted that motion in part, dismissing with prejudice all causes of action in the amended complaint, except "causes of action on (i) race discrimination under Title VII of the Civil Rights Act of 1964; (ii) age discrimination under the Age Discrimination in Employment Act (ADEA); and (iii) unlawful retaliation under Title VII and the ADEA." Dkt. #28.[5] Following discovery, Bayshore filed a motion for summary judgment. The District Court granted that motion, determining that McKinney had failed to establish a prima facie case of discrimination under Title VII and the ADEA, as she had failed to show that she was subject to any adverse employment action. McKinney timely appealed.

III.

---

[3] McKinney had sued individual defendants, as well as Bayshore.

[4] McKinney has waived any challenge to this decision, as she does not challenge this decision in her brief on appeal. See Voci v. Gonzales, 409 F.3d 607, 609 n.1 (3d Cir. 2005).

[5] McKinney has also waived any challenge to this decision, as she does not meaningfully challenge it in her brief. See id. at 609 n.1 (noting that a passing reference to an issue is not sufficient to bring the issue before the court).

5

We have jurisdiction over McKinney's appeal pursuant to 28 U.S.C. § 1291. "We review a district court's grant of summary judgment de novo, applying the same standard as the district court." S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 256 (3d Cir. 2013). Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[w]e view the facts and draw all reasonable inferences in the non-movant's favor," we will conclude that "[a] disputed issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Resch v. Krapf's Coaches, Inc., 785 F.3d 869, 871 n.3 (3d Cir. 2015). "We may affirm a district court for any reason supported by the record." Brightwell v. Lehman, 637 F.3d 187, 191 (3d Cir. 2011).

The burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to McKinney's claims of discrimination under both Title VII and the ADEA. See Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam). Under this framework, McKinney had the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. Id. Whether McKinney established a prima facie case is a question of law. Id.

To establish a prima facie case, McKinney was required to show that (1) she belongs to a protected class; (2) she was qualified for the position she occupied; and (3) she was subject to an adverse employment action (4) under circumstances that give rise to an inference of unlawful discrimination. See id. McKinney indisputably established the

6

first two factors. As noted, the District Court determined that McKinney's Title VII and ADEA claims failed, as she had not established that she had been subjected to an adverse employment action.

But as for the Title VII claim, we will assume without deciding that a reasonable jurist *might* find that the change in work shifts was "adverse." McKinney clearly believed that the closing shift was less desirable. However, even if we were to construe the shift change as an adverse action, the record is devoid of *any* "circumstances that give rise to an inference of unlawful discrimination." See Sarullo, 352 F.3d at 797. All employees with the same job title as McKinney, regardless of race, were required to take turns covering the closing shift, and the record established that McKinney worked fewer closing shifts than any other supervisor. We thus agree with the District Court's ultimate conclusion that McKinney failed to establish a prima facie case of discrimination.

As for the ADEA claim, we agree with the District Court that McKinney failed to establish any adverse action—she noted that younger employees were hired as supervisors (i.e., hired to be her peers), but she did not explain how that affected her employment in any way.

McKinney's retaliation claim appears to be based on the 2015 incident regarding the patient tray. An employee establishes a prima facie case of retaliation by showing "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." EEOC v.

7

Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015) (internal quotation marks omitted).

Here, we agree with the District Court that McKinney experienced no adverse employment action.[6] McKinney alleges that Hamilton yelled at her and pointed his finger in her face. This isolated verbal reprimand, which did not result in any disciplinary action against McKinney, does not rise to the level of an adverse employment action.[7] See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997) ("Robinson's allegations that she was subjected to 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' following her complaint do not rise to the level of the 'adverse employment action' required for a retaliation claim."), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).[8]

In sum, we agree with the District Court that McKinney failed to show a genuine dispute as to any material fact that would establish a prima facie case of discrimination or retaliation. We therefore will affirm the District Court's judgment.

---

[6] McKinney satisfied the first element because of her July 2013 complaint alleging racial discrimination.

[7] Further, it is highly doubtful that McKinney could establish a causal connection between her July 2013 complaint and the July 2015 meeting regarding the tray incident.

[8] McKinney appears to argue that the District Court should have granted her relief on a "hostile workplace" theory, based on this incident. But to recover for a hostile workplace claim, the plaintiff must show, among other things, that "the discrimination was severe or pervasive." Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (internal quotation

8

marks omitted).  A one-time finger-pointing incident is neither severe nor pervasive.