

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-16-00003-CV

_____

MARCUS L. NASH, Appellant

V.

AGGREGATE INDUSTRIES-WCR, INC. D/B/A
LATTIMORE MATERIALS CORPORATION, Appellee

On Appeal from the 192nd District Court
Dallas County, Texas
Trial Court No. DC-14-13243

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Marcus L. Nash, an African American, began working at the Dallas[1] location of Aggregate Industries-WCR, Inc., d/b/a Lattimore Materials Corporation (Lattimore), in 1999 as a driver of a ready-mix concrete truck. Though promoted over the years, Nash was ultimately terminated and sued Lattimore for racial discrimination and retaliation. From a no-evidence and traditional summary judgment favoring Lattimore, Nash appeals, arguing that the trial court erred in denying his motion to strike summary judgment evidence attached to Lattimore's reply brief and in granting Lattimore's summary judgment motion. We find that, even ignoring Lattimore's proposed but challenged evidence, (1) summary judgment on Nash's disparate-treatment claim was proper and (2) summary judgment on Nash's retaliation claim was proper. Accordingly, we affirm the trial court's judgment.

First, we provide some context. After being hired in 1999, Nash was promoted to Assistant Driver Supervisor in 2006 and then to Driver Supervisor of Lattimore's Dallas plant in 2010. In June of that year, Lattimore moved Nash back to the position of truck driver from his supervisory position based on an alleged racial comment from Nash to a Hispanic driver, other employees not favoring Nash in the supervisory role, and Nash's wasting company time.

Nash's retaliation claims stem from an incident in January 2014 when he was shoved by Olmo Lopez, the production manager in the Dallas plant where Nash worked. In his deposition, Nash explained that drivers were in the process of trying to ratify a vote to unionize. Lopez, of

---

[1]Originally appealed to the Fifth Court of Appeals in Dallas, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Fifth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

Hispanic descent, asked Nash's opinion about the matter. After Nash told Lopez that he would not want to hear his opinion, Lopez shoved Nash and told him to get back in his truck. Nash instructed Lopez never to push him again, and Lopez began to "apologize vehemently." Nash reported the incident to his African-American supervisor, Curtis Caro, who assured Nash that he, in turn, reported the incident to Tina Jackson, in Lattimore's human resources department. According to Nash, Caro claimed that Jackson concluded that "she couldn't find anything or the – [Lopez] said he didn't do it." Yet, Nash claimed that Lopez admitted to Caro that he shoved Nash.

On January 21, 2014, Nash was supposed to leave the plant at 7:04 a.m. in order to make a timely cement delivery, but he left at 9:23. Nash claimed that Lopez directed Caro to issue Nash a disciplinary notice for unacceptable use of company time. According to Nash, he did not receive the dispatch notice due to a technical error in "Trimview," the truck's computer display that transmitted messages from dispatch. After the incident, Lopez told Nash that he was replacing him as the "backup batch man" and would be assigning those duties to another Hispanic employee. According to Nash, "sometime after the incident" he applied for, and was denied, a quality control position with Lattimore. On June 16, Lopez issued a disciplinary notice for tardiness as a result of a no call, no show, which Nash contested.

On July 14, 2014, Nash sent to Lattimore's maintenance department the text message that eventually led to his termination. The message stated, "Truck has shut off 2 times. I'm, on 75 trying to get to the job." Part of the text message was an attached photograph depicting the dashboard in Nash's truck, establishing that Nash was driving at forty-two miles per hour at the

3

time he took the photograph with his cellular telephone. Lattimore's employee handbook contained the following discussion on the use of cellular phones:

> All employees are required to adhere to all federal, state or local rules and regulations regarding the permitted use of cell phones while driving. . . . [T]his policy applies to the use of cell phones for the purposes of text messaging, email capabilities and digital photography . . . .
>
> . . . .
>
> *Company Provided Cell Phones*
>
> Use of cell phones issued by the Company to employees while operating a vehicle is only permitted when the driver is using a hands-free device such as Blue Tooth or other similar technology. If no hands free device is used, employees are required to find a safe location to pull off the road before using the cellular or other communications device. This provision applies to all employees who operate a Company vehicle, receive a vehicle allowance from the Company, or while operating a vehicle for Company related purposes. Whether a cell phone is issued by the Company or is the employee's personal cell phone, usage without hands free while operating a Company vehicle is strictly forbidden.
>
> *Personal Cell Phones*
>
> . . . . .
>
> [T]he use of a personal cell phone while at work may present a hazard or distraction . . . to the user. Therefore this policy prohibits the possession and use of personal cell phones by production employees while operating or residing in Company equipment or vehicles. . . .
>
> . . . .
>
> *Discipline*
> Violation of this policy with result in disciplinary action up to and including termination.

When the photographs came to Lattimore's attention, Nash claimed that the "the truck was shutting down" and "was giving signs of overheating, [when] it was not overheating." Nash testified, "I'd

4

been having issues with the truck for a long time . . . at least a month or more." He claimed that the truck had shut down completely at least three times on that trip while he was driving on the highway. Nash admitted that he was required to complete pre-trip and post-trip inspections of the truck and was required to complete paperwork documenting his inspections. According to Lattimore, Nash failed to document the serious problems he was experiencing with the truck on his reports.

For violating company policy, Nash was suspended, pending an investigation. On July 23, 2014, Nash called Lattimore's "Integrity Line" and claimed that the investigation was in retaliation for his report of Lopez' assault. He also alleged that Lopez' disciplinary warnings were false. Nash's complaint was reviewed by Robert Winningham, Lattimore's Regional Human Resources Manager. Winningham met with Nash, who asked him why nothing had been done with his complaint against Lopez. On July 25, Winningham typed an email stating,

> [Nash] mentioned several times that he had no problem getting an attorney involved and th[at] he knew he had 180 days to file his complaint (I assume that is to file an EEOC complaint). He states that all of his issues go back to his complaint to his supervisor that the Area Manager pushed him, that the Area Manager has been retaliating against him since that complaint. What [Nash] does not know is that the supervisor he reported this to never told HR or the Area Manager about the complaint, so no one, other than [Nash] and his former supervisor, was aware of the allegation until a few weeks ago.

Nash testified that he met with Winningham, who informed him July 31, 2014, that the "safety review board" decided to terminate his employment because he used his cell phone while driving and failed to properly fill out the truck inspection reports.

5

Nash's lawsuit claimed that Lattimore discriminated against him based on race and that the safety investigation was in retaliation for his complaint against Lopez.[2] During his ensuing deposition, Nash admitted that he used his cell phone to take the photographs of the dashboard, but claimed that he was pulled over on the side of the highway when the photographs were taken. When confronted about the photographic evidence clearly displaying a speedometer reading of forty-two miles per hour, Nash cited to the problems he had been experiencing with the truck and testified that the speedometer could have been broken.

By affidavit, Mitch Drennen, maintenance supervisor for Lattimore, refuted Nash's claim. Drennen stated that he inspected Nash's truck after the maintenance department received Nash's text, checked the speedometer, and concluded that it was functioning normally. Based on his experience as a mechanic for twenty years, Drennen stated that "it's not possible for a vehicle's speedometer to reflect a speed of 42 miles per hour if the vehicle is stationary and the speedometer is functioning normally."

Following discovery, Lattimore filed traditional and no-evidence motions for summary judgment. Lattimore argued that Nash was terminated for violating policies and procedures by sending text messages while operating a company truck and for failing to document potentially serious mechanical problems with his truck. Lattimore contended that Nash's pleadings and evidence failed to raise an issue of disparate treatment and that, even if Nash could make a prima facie case of discrimination, there was no evidence that Lattimore's proffered reasons for

---

[2]Nash filed a complaint with the Equal Employment Opportunity Commission (EEC) alleging (1) that his termination was retaliation for reporting Lopez' assault, and (2) that "other non-African Americans under nearly identi[c]al circumstances received more favorable treatment."

6

terminating Nash were pretextual. Concerning Nash's retaliation claim, Lattimore argues that the incident happened seven months before the termination and that "reporting an alleged assault, without any evidence it was linked, in any way, to racial discrimination, does not constitute protected activity."

In support of its motion for summary judgment, Lattimore attached Winningham's affidavit, which demonstrated that he, not Lopez, was involved in the decision to terminate Nash's employment. Winningham explained that "drivers are required to conduct a detailed, comprehensive inspection of their vehicle to ensure that the vehicle is functioning properly" before each shift and must also complete detailed written summaries of both pre-trip and post-trip inspections. In his affidavit, Winningham wrote,

> On July 14, 2014, during his shift, Mr. Nash used his cell phone to take pictures of the dashboard of his Lattimore truck. He then sent the pictures via text message to a Lattimore mechanic. The pictures show that Mr. Nash was traveling at approximately 42 miles per hour when the picture was taken. Mr. Nash did not document any issues with his vehicle on his post-trip inspection report for July 14, 2014. He subsequently claimed that the truck shut down without warning and that the check engine light repeatedly turned on. Mr. Nash's failure to report these issues, as well as his use of a cell phone while operating and residing in a Lattimore company vehicle violated Lattimore's safety procedures.

Winningham also averred that Lattimore's location at which Nash was employed had twenty drivers and that sixteen were African American, two were Hispanic, and two were Caucasian. Lattimore provided a chart listing each employee's hourly wage, which demonstrated that the two Caucasian employees did not make more than the other employees and that Nash was the second-highest-paid driver. During his deposition, Nash admitted that the Dallas Lattimore plant was "[p]redominantly . . . African-American" and that his supervisor was African American.

7

In response to Lattimore's motion for summary judgment, Nash argued that he met his burden to show that Lattimore filled his position with a person who was not a member of a protected class because Lattimore had "evasively and intentionally refused to disclose the person(s) who replaced" him. To demonstrate Lattimore's evasiveness, Nash included Lattimore's interrogatory responses demonstrating that, in response to Nash's request to list each person who performed his job duties, Lattimore stated, "No person has specifically performed Plaintiff's former job duties since . . . [a]ll [ready mix] drivers have the same job duties and are hired based on an interview and possession of the required qualifications for the position." Nash also attached his own affidavit, containing the following:

> The Hispanic and White employees at the South Dallas Plant received preferential treatment and were given the more desirable job duties and concrete deliveries. The Hispanic and White employees were also given better work hours and could choose the days they wanted off, while the African-American drivers and me specifically, were not afforded the same treatment. The African-American drivers, and me specifically, were usually given the longest deliveries and were also usually the last one to be allowed to go home. Also the Supervisors would approve the non-African-Americans vacation time without issue, while the African-Americans, specifically me, were usually denied vacation time or hassled about taking vacation time. Ready Mix Drivers, Melvin Stanley (African-American) and Eric Turner (African-American) also had complained about the way Lopez treated them.

After reviewing the evidence, the trial court granted Lattimore's motions for summary judgment.[3]

Lattimore raised both traditional and no-evidence points below. "The standards for reviewing both types of summary judgment are well established." *McCoy v. Tex. Instruments*,

---

[3]We omit any reference to Lattimore's reply brief, and the evidence attached to it, without addressing the question of whether the trial court erred in granting Lattimore leave to file it three days before the hearing.

8

*Inc*., 183 S.W.3d 548, 553 (Tex. App.—Dallas 2006, no pet.) (citing TEX. R. CIV. P. 166a(c), 166a(i)). "Under a traditional motion for summary judgment, the moving party carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000)). "After the movant produces evidence entitling it to summary judgment, the burden then shifts to the nonmovant to present evidence of any issues that would preclude summary judgment or create a fact issue." *Id.* (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996); *Muckelroy v. Richardson Indep. Sch. Dist.*, 884 S.W.2d 825, 828 (Tex. App.—Dallas 1994, writ denied)). "Any doubts about the existence of a genuine issue of material fact are resolved against the movant, and all evidence and any reasonable inferences must be viewed in the light most favorable to the nonmovant." *Id.* (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985)).

When a party asserts "that no evidence exists as to one or more elements of a claim on which the nonmovant would have the burden of proof at trial, the burden is on the nonmovant to present enough evidence to raise a genuine issue of material fact on each of the challenged elements." *Id.* "In determining whether the nonmovant has met its burden, we review the evidence in the light most favorable to the nonmovant and resolve all doubts in its favor." *Id.* (citing *Crocker v. Paulyne's Nursing Home, Inc.*, 95 S.W.3d 416, 419 (Tex. App.—Dallas 2002, no pet.)). "When the trial court does not specify the basis for its ruling, it is appellant's burden on appeal to show that each of the independent grounds asserted in support of summary judgment is insufficient to support summary judgment." *Id.* at 553–54.

> A no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Id.* at 554 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Benners v. Blanks Color Imaging, Inc.*, 133 S.W.3d 364, 368 (Tex. App.—Dallas 2004, no pet.)). "Thus, a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact." *Id.* (citing *Benners*, 133 S.W.3d at 368). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Benners*, 133 S.W.3d at 368). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Benners*, 133 S.W.3d at 368).

*(1)     Summary Judgment on Nash's Disparate-Treatment Claim Was Proper*

"The legislature enacted the Texas Commission on Human Rights Act ('TCHRA') to correlate state law with federal law in the area of employment discrimination." *McCoy*, 183 S.W.3d at 554; *see* TEX. LAB. CODE ANN. § 21.051 (West 2015). One purpose of the TCHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." TEX. LAB. CODE ANN. § 21.001(1) (West 2015). The TCHRA prohibits an employer from discriminating against an individual with respect to "compensation, or the terms, conditions, or privileges of employment" "because of race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE ANN. § 21.051.

10

"Federal and state laws protecting employees against discrimination and retaliation were not intended to be vehicles for judicial second-guessing of employment decisions nor intended to transform courts into personnel managers." *McCoy*, 183 S.W.3d at 555–56. "Absent a discriminatory motive, a disagreement between an employer and employee over assessment of job performance is not actionable." *Id.* at 566. "Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason for a termination." *Id.*

"In a circumstantial evidence race discrimination case, such as the one before us, the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden shifting test applies." *McCoy*, 183 S.W.3d at 554. "Under this test, the plaintiff must first establish a prima facie case of discrimination." *Id.* "To establish a prima facie case of discrimination, the employee must show [he] (1) is a member of a protected class; (2) was qualified for [his] position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of [his] protected class or others similarly situated were treated more favorably (disparate treatment cases)." *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 654 (Tex. App.—Dallas 2012, no pet.). "Subjective beliefs alone are insufficient to establish a prima facie case."[4] *McCoy*, 183 S.W.3d at 554.

---

[4] "Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate legitimate, non-discriminatory reasons for any alleged unequal treatment." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 803; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001)). "The offer of a legitimate reason eliminates the presumption of discrimination created by the plaintiff's prima facie case." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). "The burden then shifts back to the plaintiff to show the employer's stated reason was a pretext for discrimination." *Id.* at 555 (citing *Toennies*, 47 S.W.3d at 477). "A plaintiff can raise a fact issue as to pretext if the evidence, taken as a whole, shows the employer's stated reason was not what actually motivated the employer and creates a reasonable inference that race was a determinative factor in the

"For purposes of discrimination, the [TCHRA] addresses [only] ultimate employment decisions; it does not address every decision made by employers that arguably might have some tangential effect on employment decisions." *Navy v. Coll. of the Mainland*, 407 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Nash's petition alleged unlawful termination based on race. Certainly, Nash is a member of a protected class who suffered an adverse employment action. However, in order to make a prima facie case, Nash was required to bring forth evidence demonstrating either that he was replaced by a member of a non-protected class, or that other similarly-situated employees were treated more favorably. *Jespersen*, 390 S.W.3d at 654; *McCoy*, 183 S.W.3d at 555.

Nash claims to have established that he was replaced by a member of a non-protected class, because Lattimore refused to disclose who replaced him. This argument is not evidence. Furthermore, Lattimore's interrogatory responses stated that no one had performed Nash's duties since all ready-mix drivers had the same duties. There was no evidence that Nash was replaced or that he was replaced by a member of a non-protected class.[5] *See Jespersen*, 390 S.W.3d at 655–56. Thus, he had to establish disparate treatment.

"Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Navy*, 407 S.W.3d at 900. "To

---

complained-of actions." *Id.* (citing *Elgaghil v. Tarrant Cty. Junior Coll.*, 45 S.W.3d 133, 140 (Tex. App.—Fort Worth 2000, pet. denied)). "The plaintiff retains the burden of persuasion to prove by a preponderance of the evidence he was discriminated against because of his race." *Id.*

[5]Nash's affidavit stated that, prior to his termination, Lopez had removed Nash as backup batch man and had assigned that duty to Juan Serna. This fact did not address the ultimate employment decision.

prove discrimination based on disparate discipline, the disciplined and undisciplined employees' misconduct must be of "comparable seriousness.'" *Id*. (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)). "[T]he plaintiff must usually show that the misconduct for which he was disciplined or discharged was nearly identical to that engaged in by an employee outside the plaintiff's protected class who was not disciplined or discharged." *Id.*

The record establishes that Nash was terminated for safety violations. Because there is no evidence in the record of any other employee with a similar history of safety issues, Nash failed to offer any evidence that non-protected employees were not treated similarly. *See Navy*, 407 S.W.3d 893.[6] The trial court did not err by granting summary judgment as to Nash's discrimination claim.[7]

---

[6]Nash relied entirely on his affidavit to demonstrate that he produced evidence of discrimination. Lattimore contends that Nash's affidavit is conclusory. We agree that Nash's affidavit is conclusory and that it did not save Nash from the lack of evidence on the prima facie elements.

"Affidavits consisting only of conclusions are insufficient to raise an issue of fact to defeat a motion for summary judgment." *Hill v. Hill*, 460 S.W.3d 751, 757 (Tex. App.—Dallas 2015, pet. denied) (citing *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984)). "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Bastida v. Aznaran*, 444 S.W.3d 98, 105 (Tex. App.—Dallas 2014, no pet.). Nash claimed that "supervisors, would approve the non-African-Americans vacation time without issue, while the African-Americans, specifically me, were usually denied vacation time or hassled about taking vacation time." He provides no underlying facts to support the conclusion that supervisors, including African-American supervisors, favored non-African Americans while approving vacation time. Nash also stated that African-American drivers were usually given the longest deliveries and were the last ones to be allowed to go home. Again, he provides no underlying facts to support his conclusion. Further, because drivers were paid by the hour, he offers no evidence, aside from opinion, that drivers did not prefer longer deliveries. Next, Nash states that non-African Americans were given better work hours and could chose the days they wanted off. Without the underlying facts, Nash's opinion about better hours was conclusory. Accordingly, the statement in his affidavit that non-African Americans received preferential treatment and were given more desirable job duties amounted to subjective opinion, not evidence. Last, although Nash claimed that two out of the sixteen African-American drivers complained of Lopez, he did not say that the complaints were the results of racial discrimination.

[7]Further, even if Nash had succeeded in establishing a prima facie case of discrimination, Lattimore articulated legitimate, nondiscriminatory reasons for terminating Nash. "To raise a fact issue on the pretext element of a discrimination claim, the employee must present evidence proving the reasons stated by the employer were not its true reasons, but were a pretext for discrimination, or the reasons were not credible." *Jespersen*, 390 S.W.3d at 655. "The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the termination." *Id.* "The employer 'is entitled to be unreasonable so long as it does not act with discriminatory animus.'" *Id.* (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th

13

*(2)    Summary Judgment on Nash's Retaliation Claim Was Proper*

Nash also argues that his termination was in retaliation for reporting Lopez' assault. Retaliation is also an unlawful employment practice if taken against "a person who opposes a discriminatory practice, makes or files a charge, files a complaint, or testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE ANN. § 21.055 (West 2015). "Unlike the disparate-treatment provisions in the Act, the scope of the antiretaliation provision is not limited to conduct that constitutes 'ultimate employment decisions'; rather, the provision 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Navy*, 407 S.W.3d at 901 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

Title VII, however, is not "a general civility code for the American workplace." *Burlington*, 548 U.S. at 68. The purpose of the anti-retaliation provision is to sanction employer actions likely to deter "victims of discrimination from complaining, [a]nd normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

"The elements of a retaliation claim are: (1) the employee engaged in a protected activity, (2) the employer took adverse employment action against the employee, and (3) the employer took the adverse action based on the employee's engagement in the protected activity." *McCoy*, 183 S.W.3d at 355 (citing *Jones v. Jefferson Cty.*, 15 S.W.3d 206, 210 (Tex. App.—Texarkana 2000, pet. denied)). "The same burden-shifting analysis used in discrimination claims is also used in a

---

Cir. 2002)). Nash did not deny that the reason for termination was a safety violation, but argued that he did not take the photographs while the truck was moving.

14

retaliation claim." *Id.* (citing *Jones*, 15 S.W.3d at 210). "Once the plaintiff has established a prima facie case, the defendant employer must articulate a non-discriminatory reason for the adverse employment action." *Id.*

The first element of a retaliation claim required Nash to show that he engaged in a protected activity. Nash argues that the protected activity was his report of Lopez' assault. Yet, his own testimony established that the assault had nothing to do with race, but was the result of the drivers' unionization discussions, which were not complaints in this case. To make a prima facie case under the TCHRA, "[t]he report must have complained of some sort of discrimination covered by the TCHRA." *Lewis v. Lowe's Home Ctrs., Inc.*, No. 13-12-00629-CV, 2014 WL 2937010, at \*3 (Tex. App.—Corpus Christi June 26, 2014, no pet.) (mem. op.). "Reporting a physical altercation that is unprompted by proscribed discriminatory practices is not a protected activity under the TCHRA." *Id.* at \*4. Accordingly, we find that Nash failed to make a prima facie case of retaliation. The trial court's summary judgment on Nash's retaliation claim was proper.

Because summary judgment against Nash was proper both on his discrimination claims and on his retaliation claims, we affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:      June 3, 2016
Date Decided:        July 13, 2016

15